## COMMISSIONER OF INTERNAL REVENUE v. NORTH AMERICAN BOND TRUST.

No. 237.

Circuit Court of Appeals, Second Circuit.

Aug. 14, 1941.

CHASE, Circuit Judge, dissenting.

———◆———

Samuel O. Clark, Jr., Asst. Atty. Gen. (Sewall Key and Michael H. Cardozo, IV, Sp. Assts. to Atty Gen., of counsel), for petitioner.

Claude A. Hope, of New York City (Delafield, Marsh, Porter & Hope and James C. Mulligan, all of New York City, of counsel), for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

I distinguish the case at bar from Commissioner v. Chase National Bank, 122 F.2d 540 handed down at the same time, because here the "Depositor" had it in his power in effect to change the investment of certificate holders at his discretion, as I shall try to show. In Commissioner v. Chase National Bank, supra, each "Unit" consisted of sixteen shares in each of thirty specified companies; and each later "Unit" had to be made up of exactly that number of shares in each of those companies. Therefore, no matter how many "Units" were added, the investment of each certificate holder remained the same; the "Depositor" had no power to change them, they were "frozen," so to speak, for the duration of the trust. It is true that the "Supplemental Agreements" gave larger powers to the "Depositor" than he originally had had to "eliminate" a company, and, so far, it can be said that he had "managerial" powers; but they were far less than those of most trustees stricti juris. True, it was possible, and it

always is possible in trusts of this kind, for a beneficiary to sell out and substitute another in his place; and that certainly does make them in some sense "associations." But it does not alone bring them within the statute, else the whole discussion in Morrisey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, was unnecessary. In Lewis & Co. v. Commissioner, 301 U.S. 385, 57 S.Ct. 799, 81 L.Ed. 1174, the court spoke of "the introduction of new participants" into the trust (301 U.S. at page 388, 57 S.Ct. at page 801, 81 L.Ed. 1174) as an important consideration, and it certainly is, since without it the chief resemblance to a corporation disappears; but that feature alone is not in my judgment enough. Article 801-3 of Regulations 86 itself concludes by saying that it is "the purpose and activity" of the enterprise that determines whether it is a trust.

█ The reason why I think that in the case at bar the taxpayer is liable is because as I have said the "Depositor" really had power to vary the investments. This arose for the following reasons. He was to select the bonds which should make up a given unit—in this instance called an "Interest" —and when he did so he could not change its composition except for reasons which arguendo I shall assume did not give him "managerial" powers. So far the venture was not unlike that in Commissioner v. Chase National Bank, and could not be said to give an opportunity to take advantage of variations in the market; but the important difference was that in making up another unit the "Depositor" was not confined to the same bonds that he had selected for the first; and so on, for as long as new money came in. Even so, possibly the scheme might have been a "trust" if each unit had remained water-tight, so to speak; that is, if a certificate holder had been confined to the securities of his own unit. But that was not the case; on the contrary the bonds of all units constituted a single pool in which each certificate holder shared according to his proportion of all the certificates issued. Thus, every time the "Depositor" made up a new unit, composed of different bonds from the preceding units, he reduced the interest of existing certificate holders in the bonds which they had up till then owned, and substituted in the place of the interest so taken an interest in new bonds. That meant that the "Depositor" had power, though a limited power, to vary the existing investments of all certificate holders at will,

for as long as any new money came in; and in this way to take advantage of market variations to improve the investments even of the first investors. It is true that this was far from the full powers of the manager of an investment trust, but it was a broad enough power when coupled with the free "introduction of new participants" and with the power to "eliminate" bonds which had become undesirable, to turn the venture into a "business," i. e. a method of profiting by the rise and fall of securities.

Reversed.

AUGUSTUS N. HAND, Circuit Judge.

What I have said on the appeal from the orders in Commissioner v. Chase National Bank, 2 Cir., 122 F.2d 540 applies a fortiori to the above appeal which ought, therefore, to be reversed. I should concur unreservedly in the opinion of Judge LEARNED HAND in the present proceeding were it not for the fact that he distinguishes Commissioner v. Chase National Bank from the case at bar. While there are factors here which give added weight to the classification of the arrangement as an association, I think the arrangement in Commissioner v. Chase National Bank also created an association for income tax purposes. Reversed.

CHASE, Circuit Judge (dissenting).

This petition to review a decision of the Board of Tax Appeals expunging a deficiency in the income taxes of the respondent for the fiscal year ending August 31, 1936 involves questions similar to those raised by the petition in Commissioner v. Chase National Bank 122 F.2d 540 in which the decision of the Board, 41 B.T.A. 430, has been affirmed in an opinion handed down herewith. The Commissioner determined the deficiency on the ground that respondent was taxable as a corporation under Sec. 801(a)(2) of the 1934 Act, 26 U.S.C.A. Int.Rev.Acts, page 790. The Board, following its former decision, reversed the Commissioner.

The facts were stipulated and were found by the Board as follows:

"City Bank Farmers Trust Company, hereinafter referred to as 'the Trustee,' is a trust company duly organized and existing under the Banking Law of the State of New York. Distributors Group, Incorporated, hereinafter referred to as 'the Depositor,' is a corporation duly organized

under the laws of the State of Delaware and doing business in New York City.

"On September 1, 1932, a trust agreement was entered into between the Depositor, the Trustee, and the Registered Holders, from time .to time, of North American Bond Trust certificates, hereinafter referred to as 'the Holders.' The trust set up pursuant to this agreement was known as the North American Bond Trust.

"By the agreement, and simultaneously with its execution, the Depositor was required to deposit with the Trustee 311 bonds of $1,000 each, conforming to requirements more fully set out below. The deposit was to be accompanied by a sum in cash equivalent to the face amounts of coupons which had matured on or prior to the date of deposit and on or after September 1, 1932. Simultaneously with the deposit, the Trustee was to issue certificates representing 360 equal, undivided, equitable interests in the deposited bonds each interest to be registered in a name to be designated by the Depositor.

"At any time prior to the termination of the agreement, the Depositor might cause additional interests to be created for the account of others. In order to create such an interest, the Depositor had to deposit with the Trustee an amount equal to the then value of an interest. These values were to be determined every business day by the Depositor, using listed prices on the New York Stock and Curb Exchanges, where available, or the best available information. To the value of the bonds thus found was added the cash held by the Trustee as part of the deposited property, including currently distributable funds, and the value of each interest was determined by dividing this total by the total number of interests.

"Having found the total amount to be deposited, the Depositor was then required to buy an eligible bond especially for the purpose, accompanying it with a bill of sale from the seller stating the fact of such special purchase, and to deposit it with the Trustee with unmatured coupons attached, together with a sum in cash equal to the amount of any moneys then held by the Trustee as currently distributable funds, applicable to the number of interests to be credited, and additional cash equal to the face value of coupons maturing prior to the date of deposit and on or after the first day of the current semi-annual period. In case the cost of the bond plus the cash

above specified did not equal the then value of an interest, the Depositor was required to deposit sufficient additional cash to make up the difference.

"Each deposit was to be accompanied by a memorandum from the Depositor, upon which the Trustee might conclusively rely, showing the amount to be deposited and certifying that the bond was eligible.

"Upon receipt of the deposit, the Trustee was then to issue a certificate of interest to the person or corporation for whom the interest had been created. The bonds and cash received were commingled with the previous deposits into one trust fund, each interest ranking pari passu with every other interest outstanding. The certificates were not assignable, except by operation of law, by reason of the death of the holder, or by and to the Depositor. The right to surrender a certificate and receive its cash equivalent, however, might be freely assigned.

"The Depositor was entitled to collect a fee for causing the interest to be created and to exact a commission in case it acted as broker in the purchase of the bond.

"All the cash received by the Trustee in connection with deposits, except the cash required if the cost of the bond, etc., did not equal the value of an interest, was to be credited to currently distributable funds, and income, earnings and interest upon the deposited property was to receive the same treatment. It was also provided generally that the Trustee should treat the trust property in a manner similar to property held by it under a personal deed of trust. Moneys credited to currently distributable funds were to be held until the time appointed for disbursement to the interest holders, and were not required to be invested. The Trustee was empowered to retain in cash out of the moneys held by it as part of the deposited property, other than currently distributable funds, a sum equal to one per cent of the principal amount of deposited bonds and not in excess of $50,000. This fund was to be used whenever interest holders desired to convert their certificates into cash.

"Currently distributable funds were all moneys received by the Trustee as income, earnings and interest on the deposited property, all cash credited to currently distributable funds upon the issuance of certificates, the proceeds of called or matured bonds, and the proceeds of bonds required to be sold, less taxes, charges, fees of the

Trustee and the Depositor and such portions of currently distributable funds as were allocable to certificates surrendered for cash.

"All other moneys received by the Trustees as part of the deposited property, other than currently distributable funds, were to be used by it in the acquisition of eligible bonds. The Trustee was to notify the Depositor at the end of each month of any funds available for this purpose. The Depositor was thereupon to certify to the Trustee specific bonds conforming to the requirements set forth below and which, in its opinion, if included in the deposited property, would preserve the quality of the investment of the certificate holders. The Trustee was then to acquire the designated bonds and hold them as part of the trust property. If the Depositor notified the Trustee that it no longer intended to certify its opinion as to eligible bonds, the Trustee was then to take the advice of two independent investment counsel. The Trustee had no duty to acquire any bonds until it received the advice of the Depositor or investment counsel.

"The Trustee had power to deposit any bond held in the trust with any proper protective or reorganization committee, to participate in any plan of reorganization or refinancing which it might deem in the best interests of certificate holders, to hold evidences of participation in any such plan, and to pay out of trust property any charges or taxes necessary in connection therewith.

"The Depositor was authorized to certify to the Trustee from time to time that in its opinion certain bonds should be eliminated as investments, in order to preserve and protect the quality of the investment of the certificate holders. Upon receipt of such a certificate counsel, and if the latter concurred in the Depositor's opinion, the Trustee had to sell and eliminate the specified bonds. If the investment counsel did not concur, the Trustee might exercise its discretion. A second investment counsel might be consulted if the Depositor abandoned its right to advise eliminations. The proceeds of such a sale were to be credited to currently distributable funds. The Trustee had no duty to eliminate bonds until it was so advised by the Depositor or investment counsel.

"Any distribution other than bonds received by the Trustee upon the deposited property pursuant to a plan of reorganization or otherwise was to be sold and the proceeds credited to currently distributable funds.

"As originally drawn, the agreement provided that if any bond should be called for payment or should mature prior to final liquidation of the trust property, the Trustee was to credit any profit to currently distributable funds and hold the remainder for reinvestment. On August 30, 1933, respondent ruled that the trust was taxable as an association. Thereafter the agreement was amended to provide that the proceeds of bonds called for payment or maturing prior to liquidation if the trust should be credited in toto to currently distributable funds. On September 22, 1933, respondent ruled that in view of the amendment, the trust was no longer taxable as an association.

"The bonds eligible for deposit with or acquisition by the Trustee had to be obligations of the United States, obligations unconditionally guaranteed as to principal and interest by the United States, obligations of the Dominion of Canada or of a province thereof, obligations of corporations of which the earnings bore a specified relation to fixed charges, and whose business was principally transacted in the United States or Canada, or railroad equipment trust certificates. The Depositor was to review the bonds every three months to see if they still met these requirements and to notify the Trustee as to such issues as were no longer eligible. Thereafter no bonds of the ineligible class could be added to the trust fund, but the trustee was not required to sell such bonds as had become ineligible. Sales were to be made, as stated above, only when certified by the Depositor and an independent investment counsel to be necessary, to preserve the quality of the investment of the certificate holders. Investment counsel could be hired to perform the review as to eligibility if the Depositor decided to abandon this activity.

"On March 15 and September 15 of each year, the Trustee was required to distribute to the certificate holders an amount equal to the appropriate proportionate part of the currently distributable funds available for distribution as of the close of business on the last day of the preceding February or August. The sum distributable in respect of such interest was to be computed by dividing the currently distributable funds available for distribution by the number of certificates outstanding. Before making the distribution the trustee could withhold a

sum estimated to be necessary to cover liability for taxes and assessments. All interest, profit and other income received by the Trustee was to be deemed to be income to the holders of the certificates and to be included in their income tax returns.

"The trust was to terminate on August 31, 1952. At any time prior to then, any certificate holder might present his certificate to the Trustee and receive his proportionate share of the then market value of his interest. Upon surrender of a certificate the Trustee was required to cancel it. The Depositor had the option to purchase any certificate so presented for conversion by paying a sum equal to the net amount payable by the Trustee, and upon such purchase become the absolute owner thereof.

"In order to pay the holders who should surrender their certificates for conversion, the Trustee was to draw upon currently distributable funds for that portion of the payment so allocable and for the balance was to use moneys held in the special one per cent conversion fund mentioned above. Should the amount thus available prove insufficient, the Trustee was to sell enough bonds to make up the difference.

"The Trustee was to start liquidating the deposited property six months prior to August 31, 1952, but if the market were unfavorable it could defer such liquidation in its discretion. Final distribution was to be made equally and ratably among the certificate holders, after deduction of all expenses, taxes and charges.

"The Trustee was not to be liable for any action taken or omitted in good faith under the agreement. It was not required to prosecute or defend any action in connection with the agreement or otherwise which would in its opinion involve it in any expense or liability, unless security and indemnity were furnished it. It could employ attorneys, agents and investment counsel but was not to be liable for actions undertaken in good faith by their advice. It could reimburse itself for advances out of currently distributable funds, or if these should be insufficient, out of the conversion fund, or if that were still insufficient, it could sell a sufficient number of bonds. It covenanted and agreed that no person nominated by it to hold the deposited property should pledge, sell or otherwise dispose of the deposited property other than for the account of the trust. It was required to make written reports concerning the administration of the Trust whenever the De-positor should require. It was not to resign as Trustee for any reason.

"The Depositor could employ attorneys, agents, and investment counsel but was not to be held liable for acts done in good faith in reliance on their advice. It agreed that it would maintain its corporate existence so far as it was able for the duration of the trust and until final liquidation. It could assign all its rights under the agreement to another person, firm or corporation, provided the assignee assumed all its obligations under the agreement.

"The agreement was to be performed in the State of New York and construed by its laws. Nothing contained in the agreement was to constitute the certificate holders, the Trustee and the Depositor as association. One clause read: 'It is expressly understood and agreed by and between the parties hereto and each of them that it is their intention, by becoming parties to this Agreement, to create the relationship of Trustee and cestuis que trustent between the Trustee and the holders from time to time of Certificate and that such holders by virtue thereof hold no relation to the Trustee other than that of cestuis que trustent and hold such rights subject only to such obligations as are conferred or imposed upon them as such cestuis que trustent hereunder. The parties hereto and each of them hereby state that it is not their intention to create a partnership, an association, a bailment, or any form of legal relation other than that of a true trust.'

"In any judicial proceeding to determine questions under the agreement every certificate holder was deemed to be represented by the Trustee if the latter should be a party to the proceeding; but the Trustee was not required to appear unless duly indemnified as stated above.

"It was further provided that the death or incapacity of a certificate holder should not operate to terminate the trust nor entitle his legal representative to an accounting, partition or winding-up. Each certificate holder, by becoming such, waived his rights to require an accounting from the Trustee.

"The agreement could be modified or amended by the Trustee and the Depositor acting together, without the consent of the certificate holders, but not in such a way as adversely to affect their substantial rights.

"In the taxable year, the Trustee received $287,931.10 as interest on deposited bonds, $97,918.38 as capital gain on bonds and

$162.50 in bonuses on exchange of bonds. Expenses totalled $26,411.88, leaving a net income of $359,600.10. During the taxable year the Trustee received $1,496,224.76 by reason of the calling or maturing of bonds held in the trust (including $36,184.76 received from the sale of called bonds shortly before their redemption dates). The Trustee received $102,517.37 by reason of sales made to provide funds for liquidating the interests of certificate holders who had surrendered their certificates for cash. In making these sales, a net capital loss of $27,478.88 was incurred.

"Approximately 130 different issues of bonds were represented in the trust fund.

"The Trustee did not eliminate any bonds during the taxable year in order to preserve the quality of the investment of the certificate holders. It did not purchase any bonds or other property during the taxable year. All of the net income was duly paid or credited to the certificate holders.

"During the taxable year, the certificate holders liquidated 138 interests, receiving a total of $102,530.39. In the same period the Depositor credited 2,202 interests for the accounts of others and deposited bonds in the principal amount of $1,621,000 with the Trustee. On September 1, 1935, there were 7,248 interests outstanding, having a book value of $5,738,046.15; and on August 31, 1936, there were 9,312 interests outstanding, having a book value of $6,266,340.77. The certificate holders numbered 1,733 at the beginning of the year and 2,102 at the end.

"No provision in the trust agreement was made for and no meetings of the certificate holders have ever been called or held. Nor was any such provision made for and the trust has never had a minute book or seal, officers, board of directors or similar governing body. It has never owned any property except bonds or money. Its books were kept and its returns made on a cash basis."

This trust, like those in Commissioner v. Chase National Bank, 2 Cir., 122 F.2d 540, was created and administered to hold property for investment with only such changes by way of disposal of property held as a sound investment policy required. So far as that similarity goes the reasons underlying the decision in the Chase Bank case apply equally here and, if decisive, lead to the same result. The Board was, accordingly,

right unless the provisions as to the creation of additional interests make a substantial difference and put this trust within the scope of Sec. 801(a)(2) of the Revenue Act of 1934.

In the Chase trusts the depositor had no discretion in the make-up of new units. They had to consist of the same number of shares in the same corporations that made up the other units adjusted by cash deposits to equalize values represented by undistributed funds. Thus, the creation of new units could in no way effect the investment of those already holding trust shares. Here, whatever remained of the original deposit of three hundred and eleven bonds which was the initial trust corpus was itself increased whenever a new interest was created. The limitation upon the action of the depositor was not in kind with cash adjustments to equalize value without affecting the value of units in being but only in value so that the bond plus cash added would increase the trust property to the amount of the determined value of the new interest. The new bond did not have to be the same as any previously held and when added was but a component part of one whole to secure the investment of all holders of certificates representing interests. In this way the depositor could make some change in the character of the trust corpus after certificate holders had made their investments.

Even so, there was no opportunity to sell property held to take advantage of profitable market conditions; nor to reinvest the proceeds or the earnings. Whatever property became a part of the corpus had to remain there for purposes of investment unless eliminated to conserve the sound investment character of the trust. The ability to make a profit by selling and buying as favorable opportunities might present themselves was absent and the overpowering characteristic of the trust was that of holding the property to receive and distribute whatever earnings there might be. I think this trust so much more closely resembled a strict trust of the fixed type than it did a corporation that the Board came to the correct conclusion by applying the principles stated in the Chase Bank case. But both of my brothers think otherwise and the decision is consequently reversed in accordance with their separate opinions.

Reversed.