COMMISSIONER OF INTERNAL REVE-
NUE v. CHASE NAT. BANK OF CITY
OF NEW YORK (four cases).

Nos. 233–236.

Circuit Court of Appeals, Second Circuit.

Aug. 14, 1941.

AUGUSTUS N. HAND, Circuit Judge, dissenting.

Samuel O. Clark, Jr., Asst. Atty. Gen. (Sewall Key and Michael H. Cardozo IV, Sp. Assts. to Atty. Gen., of counsel), for petitioner.

Weston Vernon, Jr., of New York City (Timothy N. Pfeiffer, Hugh L. M. Cole, and Jesse R. Fillman, all of New York City, of counsel), for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Four petitions to review decisions of the Board of Tax Appeals redetermining deficiencies in the income taxes for 1934 of four separate investment trusts were consolidated and heard together.

The Chase National Bank of the City of New York is the trustee of each trust created by an agreement made with it by the American Depositor Corporation, a New York corporation with its principal office in the City of New York. The Commissioner determined that each trust was to be classed as an association whose income was taxable, under Sec. 801 (a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 790, like that of a corporation. The Board held that they were not taxable under the provisions of that statute and the Commissioner brought petitions for review.

Two of the trusts were ceated when the American Depositor Corporation and the Chase Bank executed two agreements in September, 1931, dated as of July 1, 1931, whereby two fixed trusts called "Corporate Trust Shares, Accumulative Series" and "Corporate Trust Shares, Series AA" came into being. On September 23, 1932, the other two trusts were created when the same parties executed what are called supplemental agreements to set up what are known as "Corporate Trust Shares, Accumulative Series (Modified)" and "Corporate Trust Shares, Series AA (Modified)."

The purpose underlying each trust was to provide investors with a means for acquiring an undivided beneficial interest in a comparatively static list of securities and enable them to participate in a relatively wide-spread investment.

In the case of the Accumulative Series first created, The American Depositor Corporation, which will be called the depositor for convenience, chose common stocks of thirty American corporations after due consideration of their favorable characteristics for investment purposes and made up what were called "units" consisting of sixteen shares of the common stock of each corporation. The units were deposited with the Chase Bank, which will now be called the trustee, and the trustee issued to the depositor certificates which in the aggregate entitled the holders to ten thousand undivided one ten-thousandth interests in a unit. These certificates will be called trust shares. The agreements provided that the depositor might make up additional units of the same number and kinds of stocks, adjusted to reflect any common stock received on the first unit by way of a stock dividend, merger, consolidation, sale of assets, or exchange of stock and that like certificates representing trust shares should be issued by the trustee upon the deposit with the trustee by the depositor of an additional stock unit together with cash equal to any undistributed cash held by the trustee on account of previously deposited units. The stock certificates making up the units were to be registered in the name of the trustee or its nominee and it had generally all the rights of an owner, except as to voting, which the depositor controlled, and as to disposal which was governed by the agreement. The trustee was to receive all increase by way of distributions and on June 30th and December 31st in each year to pay to holders of trust shares their proportionate share of currently distributable funds upon the presentation of coupons. What was to be treated as currently distributable funds was carefully defined in the agreement and comprised what should be received in stated ways less specified expenditures.

The trustee's duties in holding the stock in the units were prescribed in lengthy detail and it could exercise discretion as to such matters only in respect to an option given in connection with a reclassification or change in capital structure or in agreeing to proposals made by a protective committee when the wishes of a majority of the stockholders could not be ascertained.

The depositor was, as found by the Board, given the right within ninety days after the occurrence of stated events to notify the trustee "that it found the purchase of a certain stock in the stock unit portfolio impracticable or inadvisable, whereupon it became the trustee's duty to sell all

shares of that stock held by it. The events entitling the depositor to this right were (a) that less than 2,500 shares of the stock had been sold during a 5-day period on the New York Stock or Curb Exchange; (b) that the stock had been removed for 3 days from the trading privileges of an exchange; (c) that the market value of the stock exceeded 30 times its annual cash dividends; (d) that a stock, paying dividends solely in its own common shares, had paid an annual dividend of less than 3 1/2 per cent; (e) that cash dividends on a cash-dividend paying stock had been reduced or had ceased; (f) that the market value of a stock in a stock unit portfolio exceeded 10 per cent of the market value of all. Upon the occurrence of (f), the depositor, after 90 days notice to the trustee, might in the alternative, merely reduce the number of shares of that stock in a stock unit so that its market value would not exceed 10 per cent of the market value of all shares in the unit, whereupon the trustee was required to sell such number of shares of that stock as would equally reduce the number held for all units. In its choice of these alternative actions, the depositor was directed to 'consider the preservation of the sound investment character of the Stock Units and not the making of a profit by the holders of the Trust shares as a result of the sale.' Detailed directions were added for steps to eliminate fractional shares. Upon the failure of a distribution by any constituent corporation upon its shares for one year and 30 days, the trustee was to sell the deposited shares of that corporation. In case the number of constituent corporations should fall below 16 as a result of such elimination or through merger, consolidation or dissolution, the trustee was to terminate the agreement forthwith." If events which were not specified in the agreement did occur requiring the exercise of discretion in the administration of the deposited property the trustee was given absolute discretion to take action but neither it nor the depositor was to be held liable whether such action was or was not taken except that each was to be held for "its own willful default or malfeasance."

The agreement was to be effective until June 30, 1951, but was to come to an end sooner if, and when, the stock of less than sixteen constituent corporations remained in a unit; if the taxes, expenses and assessments exceeded cash available or to be expected and the trustee did not elect to advance funds for such purposes; and if the office of trustee became vacant and the depositor failed to appoint a successor. Upon termination, the property held was to be sold and the net proceeds distributed to trust share holders in the manner stated. The compensation of the trustee was to be paid by the depositor and it was to keep proper books and records open to inspection by the depositor and holders of trust share certificates.

These certificates "were to be issued by the trustee and countersigned by the depositor, to contain a list of the shares held in each constituent corporation, corrected to reflect changes in the portfolio, and to bear detachable coupons of the bearer's right to participation in the semi-annual distribution of currently distributable funds, and assignable, if unnregistered, by delivery merely and, if registered, by transfer upon the trustee's books. Coupons were transferable by delivery in either case, and were payable upon presentation. Certificate holders would in no event be liable, and persons dealing with the trustee were to look only to deposited property for the satisfaction of claims of any sort." It was further provided that certificate holders might not vote or give their consent in respect to any shares held by the trustee unless the depositor had such rights and voluntarily extended them to certificate holders and also that nothing in the agreement should be construed to make the holders of certificates partners or members of an association.

The series AA agreement had practically the same provisions with these modifications: The trustee had somewhat enlarged powers to sell whatever property or rights it received on account of stocks held in a unit and if any stock in a unit should attain a market value in excess of ten per cent of all the shares in the unit the depositor could require a sale of all the shares but could not, as in the Accumulative Series, require a sale of only so many of the shares so increased in value as to reduce the market value of the part of them remaining to ten per cent of the market value of the securities in the unit.

The two other trusts were established in 1932 after the depositor had pointed out to trust share holders that when shares of constituent corporations had to be sold because there had been no distribution upon them for a year and thirty days the sale had to be made within forty-five days and

had proposed that the sale period be left to the depositor's judgment to be formed in accordance with the principles of sound investment; and an option to exchange old certificates for new was given. Many certificates were so exchanged. The term of the new trusts were those of the old respectively, modified by striking out the requirement that the trustee must sell all or part of shares held which the depositor found it impracticable or inadvisable, because of stated events, to purchase for new units and providing instead that the depositor could require the trustee to sell all or a named part of any common stock held whenever it would, in the depositor's opinion, increase the sound investment character of the stock units without regard to the making of a profit. The requirement that the trust should be terminated if the number of constituent corporations should become less than sixteen was omitted and the time within which the trustee could make required sales during the term of the agreement, or after it ended, was increased to one hundred and eighty days. Other changes related to interest allowable on deposited property and to the indemnity of the trustee for assessments, claims, tax liability and the like.

The trusts were administered in accordance with the agreements and no purchases were made by the trustee by way of reinvestment of funds or otherwise. Whatever went into any of the trusts was held until some disposition of it was made under the terms of the agreements to maintain the sound investment character of the property held and distributions were made of the currently distributable funds as required. In set-up and administration they were of the type known as fixed investment trusts.

The decisive issue is whether they were organized and administered in such a way as to be associations taxable as corporations under Sec. 801 (a) of the 1934 Act and applicable regulations. This statute makes the term "corporation" include associations, joint-stock companies, and insurance companies and T.R. 86 promulgated under the 1934 Act in Art. 801–3 distinguishes an association from a trust. It does this, generally speaking, by confining the latter to the ordinary trust created to protect and conserve property for beneficiaries who merely accept the benefits "without undertaking any activity not strictly necessary to the attainment of that object" and by defining the former as an arrangement under which property is held under a trust agreement and managed "with a view to income or profit for the beneficiaries" in such a way as "to afford a medium whereby an income or profit-seeking activity may be carried on through a substitute for an organization such as a voluntary association or joint-stock company or a corporation, thus obtaining the advantages of those forms of organization without their disadvantages." Mere size is not important but the essential nature of the arrangement, whatever its form, as shown by the objects attained and the manner of their attainment is what controls for the statute does away with merely technical distinctions.

In determining the character of these trusts the powers and duties of the trustee should be added to those of the depositor in order to arrive at the full amount of permitted managerial activity and its object. When that is done we find the permitted activities could, and the actual activities did, affect the property held in trust only by weeding out whatever became unsound for investment and retaining the remainder. That, we think, prevented the trusts from being, or becoming, more than what are sometimes called strict investment trusts. What they were when created is determinable from the trust agreements and the application of the principles set forth in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, leads to the conclusion, in support of the Board's decision, that the trust property was to be held for investment and not to be used as capital in the transaction of business for profit like a corporation organized for such a purpose. This distinction is what makes the difference tax-wise. Sears, Trustee, v. Hassett, 1 Cir., 111 F:2d 961. Though what was actually done controls, Ittleson v. Anderson, 2 Cir., 67 F.2d 323, it was found that nothing was done to change the original character of the trusts. The latter involves questions of fact as to which the Board's findings are conclusive if supported by the evidence. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346. The Board, on ample evidence, found that there was no exercise by the trustee, the depositor, or both combined of "any powers beyond those which are necessary incidents to the preservation of trust property, the collection of income therefrom and its distribution to the holders of trust shares." That being so, these

trusts do not fall within the statute upon which the Commissioner relies.

Affirmed.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

The question before us is whether four separate investment trusts should be classified for income tax purposes as strict trusts or as associations taxable on income as corporations. Each "Unit" was to consist of sixteen shares in each of thirty specified companies. The money was furnished by the certificate-holders to the American Depositor Corporation, known as Depositor, which purchased the stock of the thirty specified constituent corporations from funds supplied by the certificate-holders. The trustee was to hold the property, issue the certificates and receive the income, dividends and other distributions thereon. The income was to be distributed by the trustee to the holders of the certificates. Reinvestments were forbidden. The trustee was to collect the cash and to convert the other distributions, such as stock dividends and rights, into cash and to distribute the moneys proportionately to the certificate-holders. It could sell none of the shares constituting the corpus except at the discretionary direction of the Depositor which could exercise such discretion only upon the occurrence of specified events tending to indicate that the shares of one of the thirty corporations were not desirable investments. One of the reasons for directing a sale would be because the particular shares had reached too high a figure as compared with the dividend paid. Under modified agreements the Depositor might direct the sale of any constituent shares which it regarded as an unsound investment and its power was not conditioned upon the occurrence of the specified events. The market value of the investments in the four trusts amounted to upwards of $13,-000,000 and the gains realized in the year 1934 from sales were $23,053.31.

The original agreements provided that they continue in force until June 30, 1951, but the trustee might terminate them at any time the number of constituent companies should become less than sixteen either because of the elimination of stocks on account of ineligibility, or otherwise. At any time prior to termination, any certificate-holder might surrender his certificates and, within three days, receive in exchange his proportionate share of the deposited property then held by the trustee, payments for fractional parts of shares to be made in cash. If the holder requested the trustee to sell securities to which he was entitled on demand, the trustee was obliged to endeavor to make the sale as expeditiously as possible through the usual market facilities and the holder was entitled to receive the cash proceeds of such sales when consummated. The certificates were transferable in the same manner as bearer negotiable instruments, unless registered in the name of the holder and would pass on his death to his legal representatives. The holders of certificates representing 241,885 Units surrendered them for cancellation during the year 1934.

The trustee did a very large business in 1934. It received $662,110.45 in dividends and realized through sales $137,065.07. While it was limited in its possible activities, yet a business was set up whereby a large amount of earnings was distributed to the certificate-holders in the way of income, sales attributable to capital realized $137,065.07, and capital gains amounted to $23,053.31. Moreover, any certificate-holder who wished to realize his gain because of the increased value of an investment could surrender his certificate and obtain a profit by means of a sale through his own broker, or through the trustee. In spite of limitations which were drastic not only in respect to the portfolio of stocks which could be held by the trustee, but in respect to the inability of the trustee to select other varieties of stocks, I am inclined to think that such an enterprise, in which thousands of certificate-holders were the proprietors and there was an opportunity to make large profits through the sales of stock dividends and rights and of the stocks themselves if a great increase in market value had occurred, was an association, and not an ordinary trust.

Treasury Regulations 86 Art. 801.2 expressly says that an association "includes * * * an 'investment' trust (whether of the fixed or management type) * * *".

In view of the decision in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, it may well be that an association would include a fixed investment trust if the association had nothing to do except collect income from particular property and distribute it to the beneficiaries, but here the arrangement went much farther. Under the Accumulative Series Agreement the trustee might retain any

common stock of a constituent company that was distributed as a dividend. It also might sell such stock. Under the Series AA Agreement it must sell the excess over the original number of the constituent shares issued in connection with a reclassification merger or other exchange. The Supplemental Agreements provided that any holder of a certificate held under the original agreements could become subject to the provisions of the Modified Agreements.

It seems to me that there was enough in the arrangements and activities of the trustee and Depositor to "provide a medium for the conduct of a business and sharing its gains", and I find nothing in Morrissey v. Commissioner, supra, to show that these trusts should not properly be classified as "associations" and subject to income tax as such.

For the above reasons, the contention of the Commissioner should prevail and the orders of the Board of Tax Appeals should be reversed.