**COMMISSIONER OF INTERNAL REVE-
NUE v. CITY NAT. BANK & TRUST
CO. et al.**

No. 2791.

Circuit Court of Appeals, Tenth Circuit.

May 13, 1944.

Rehearing Denied July 7, 1944.

Louise Foster, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Robert N. Anderson, and I. Henry Kutz, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Morrison Shafroth, of Denver, Colo. (W. W. Grant and Henry W. Toll, both of Denver, Colo., on the brief), for respondent.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

The sole question presented by this appeal is whether the trust involved in this case is an "association" within the meaning of Section 901(a) of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev.Code, § 3797(a). The same question involving the same trust was before us in Hamilton Depositors Corporation v. Nicholas, 10 Cir., 111 F.2d 385, and we there answered the question in the affirmative. This appeal comes to us from the United States Tax Court. It refused to follow our decision in the Nicholas case, supra, and concluded that the trust was not such an association. It based its decision upon Commissioner v. Chase National Bank, 2 Cir., 122 F.2d 540, 144 A.L.R. 1043. It concluded that there was an irreconcilable conflict between our decision in the Nicholas case and the decision by the Second Circuit. Even if the two cases are distinguishable, there can be no criticism upon the tax court for its failure to follow our decision if it is of a contrary view, for the Nicholas case is not res judicata here. See United States v. Nunnally Investment Co., 316 U.S. 258, 62 S.Ct. 1064, 86 L.Ed. 1455, 140 A.L.R. 792.

There is no uncertainty in the principles of law which must guide us in our consideration of this question. They are spelled out clearly and definitely by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 290, 80 L.Ed. 263. The difficulty, as always, comes when we apply principles of law to a given state of facts. Under the decision of the Supreme Court in the Morrissey case, the decisive factor is whether the trust is an orthodox or pure trust as distinguished from a business trust or association. The court states:

"We granted certiorari because of a conflict of decisions as to the distinction between an 'association' and a 'pure trust.'"

The court emphasizes that the trusts that are outside the definition of an association are ordinary trusts, whether created by will, deed or declaration, and are such trusts in which particular property is conveyed to a trustee, or is to be held by the settlor, in a specific trust for the benefit of named or described persons. It is pointed out that in such trusts the beneficiaries do not ordinarily plan a common enterprise or enter into a combination for the conduct of a business enterprise. Pages 356, 357, of 296 U.S., pages 294, 295 of 56 S.Ct., 80 L.Ed. 263. The same distinction between pure trusts and business trusts is made by the Ninth Circuit in Porter v.

Commissioner, 130 F.2d 276, 280, where the court said:

" 'A trust does not engage in business, for purposes of the tax, if its sole or principal object and activities are: (1) preservation of specified property; (2) liquidation of a trust estate; (3) distribution of income derived from another source. * * *' "

■ It does not follow, however, that every trust established for the purpose of conducting a business enterprise is an association within the meaning of that term as used in the act. Neither is it essential to bring a trust within the definition that the organization be identical in its structure and functionings to a corporation. As stated by the Supreme Court:

"The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." Morrissey v. Commissioner, supra, 296 U.S. page 357, 56 S.Ct. page 295, 80 L.Ed. 263.

■ In the Morrissey case, the Supreme Court said that a business trust was an association within the meaning of the act when it had: (1) A continuing entity throughout the trust period; (2) centralized management; (3) continuity of the trust uninterrupted by death among the beneficial owners; (4) means for transfer of beneficial interests; (5) limitation of personal liabilities of participants to property embarked in the undertaking.

In the Nicholas case, supra, we held that these salient features were present and that the trust was one for a business enterprise or undertaking and therefore fell within the meaning of "association" as defined in the act. It is urged that we reached an erroneous conclusion and we are respectfully asked to re-examine our pronouncements in the Nicholas case. A re-examination of the entire subject matter leads us to adhere to the conclusion which we reached in the former case, that the trust provides for a continuing entity, centralized management, continuity of the trust, means for transfer of beneficial interests, and limitation of personal liability. It therefore remains only to consider whether the trust was an association for business or was a traditional trust.

In view of the manner in which the question is again presented for review, a more detailed statement of the facts than was outlined in our previous opinion may be helpful. The Hamilton Trust was established July 23, 1931. The parties to the agreement were the Hamilton Depositors Corporation,[1] the holders of the Hamilton Trust Shares,[2] and the Guardian Trust Company,[3] the original trustee. The City National Bank and Trust Company has been substituted and is now the acting trustee. Some amendments were made at different times to the trust instrument, but its essential character remained unchanged.

The trust agreement provided that the corporation would issue certificates of beneficial interests known as Hamilton Trust shares. These were to be sold to investors under a number of different plans, including a monthly installment plan. The corporation retained a certain portion of the proceeds as payment for services to be rendered to the trust, and deposited the balance with the trustee. The agreement established a portfolio consisting of the common stocks of thirty leading corporations. It also provides for "units." A "unit" was defined as consisting of one share of the common stock of each corporation in the portfolio. There was no fixed period for the existence of the trust. Apparently it would continue so long as the corporation existed and chose to sell trust certificates.

When the trustee had received sufficient funds to purchase five units, he was required to purchase them in his name upon the written order of the corporation. Further purchases were made upon like orders as additional funds became available. The original purchase of units was divided into one thousand beneficial interests for each unit. Thereafter when additional units were purchased the market value of the beneficial interests outstanding prior to such purchase was determined by dividing the total number of such interests into the then market value of the stocks on hand, which of course would be the price paid for the new units. Having in this way established the value of the outstanding beneficial interests, such value was then divided into the total purchase price of the new units to determine the number of beneficial interests into which the new purchase was to be divided. These new interests were then charged at their market value to each

[1] Herein called the corporation.
[2] Herein called the beneficiaries.
[3] Herein called the trustee.

774

investor as his credits used in such purchase might appear.

The trust instrument provided that the corporation could, at any time it deemed it advisable, eliminate the stock of any company from the portfolio, and that the exercise of its discretion should in no matter create any claim or cause of action against it. If an elimination was made, the stock of such company in the trust must then be sold under the direction of the corporation and the proceeds added to the funds in the hands of the trustee for future investment under the direction of the corporation. The portfolio thereafter consisted of the stocks of the remaining companies. Reinvestment was limited to the remaining stocks in the portfolio.

The trust set out in detail how rights to subscribe for securities or other property of the companies, or stock split-ups, or special stock dividends should be administered. In the main, it required the trustee, upon direction of the corporation, to sell such interests and add the proceeds to the funds on hand to be used in the purchase of future units.

Any time after twelve monthly installments (or the equivalent thereof) had been made, a beneficiary could, upon notice to the corporation, liquidate any part or all of his interest in his certificate. It thereupon became the duty of the corporation to dispose of his interest in the trust certificates as shown by the books of the corporation at the closing market price of the securities as of the first business day following the receipt of the notice. The sale price, plus any interest in cash on hand, was in such case paid to the beneficiary within five days. To facilitate the payment for certificates cashed in, the trustee, upon direction of the corporation, was required to use all cash in the funds of the trust in payment of such certificates and in case such demands were in excess of the cash on hand, the corporation could advance on open account the amount necessary to pay such demands, and be reimbursed by the trustee from future cash coming into his hands.

Upon the expiration of a twelve and one-half year period from the date when the certificate was issued, the beneficiary could exercise one of three options: (1) His interest in the trust could be sold in the same manner as is provided for in the event of liquidation, or (2) if his interest was suffi-

cient to pay for at least one share of each of the underlying securities, such securities could be distributed in kind and any fractional amount would be paid in cash, or (3) He could have his certificate extended for an additional seven and one-half year period. If he extended his certificate he could elect to receive his dividends in cash or let them accumulate by reinvestment. Thirty days prior to the expiration of the twelve and one-half year period, the corporation was required to serve written notice by registered mail on the investor, notifying him of his termination options and requesting him to make his election. If he made no election before the expiration date, his interest remained invested and all dividends thereafter remained for reinvestment for his account.

A sales force, consisting of salesmen, district and state managers, was set up by the corporation to sell Hamilton Trust certificates. The certificates were listed on the stock exchange. Anyone, including corporations, could purchase them. The depositor corporation could itself become the owner of these certificates with the same rights as other holders. The trustee had power to contract with the corporations or any other companies, whether in relation to trust shares or otherwise, and had power to take any action it deemed advisable in connection with the execution of the trust.

In connection with the promotion of the enterprise, the corporation issued a lengthy prospectus entitled "The Hamilton Investment Plan." It set out in great detail the operation of the plan. Following are a few of the representations made:

"By combining the investment funds of many investors, the Hamilton Plan enables its investors to purchase, even with small payments, an actual interest in these companies.

"We have chosen common stocks rather than limited income securities because past experience has shown that they offer the *greatest profit possibilities.*[4]

"* * * We believe that diversified common stocks offer the greater protection against inflation.

"It offers the large investor or *business corporation* a systematic method of investment at regular intervals.

"You need not wait to accumulate a substantial sum before you can purchase an

---

4 Emphasis, wherever shown, is supplied.

*undivided beneficial interest* in a list of diversified and seasoned common stock.

"Nevertheless, past experience has indicated that long-term ownership of seasoned common stocks offers excellent *income and profit opportunities.*

"Accordingly, we have adopted the Hamilton Systematic Plan because we believe that it offers a method on the one hand of retaining much of the *opportunity to profit from rising markets,* * * *

"It is true that in a market which rises for a long period, the appreciation in value of your Beneficial Interests will be considerably less than the *profit* of an investor who is lucky enough to invest all his funds at the *earlier part of the rise."*

As pointed out, the United States Tax Court based its decision in this case upon the decision of the Second Circuit in the Chase National Bank case, supra. Aside from the legal principles which they enunciate, decided cases are of small help in the solution of these problems, because in the end the answer turns upon facts, and these generally differ in each case. It is not necessary to the decision of this case to adopt or reject the doctrine of the Chase National Bank case. The cases are clearly distinguishable upon the facts, as will be shown by a careful reading of the decision by the Board of Tax Appeals, 41 B.T.A. 430, where the facts are narrated with more particularity then in the decision by the Second Circuit. It may also be noted that the Chase National Bank case was decided by a divided court and contains a strong dissent which challenges serious consideration. On the same day the Second Circuit also decided Commissioner v. North American Bond Trust, 122 F.2d 545, holding that that trust was an association within the meaning of the act. This case likewise was decided by a divided court. The emphasis by the majority of the court in the Chase National Bank case was on the fact that the trustee had no discretion to vary the investment by eliminating stock for the purpose of realizing a gain or profit on reinvestments, while in Commissioner v. North American Bond Trust the trustee had such discretion. In Pennsylvania Company for Insurance, etc., v. United States, 138 F.2d 869, the Third Circuit held a somewhat similar trust to be an association within the meaning of the Revenue Act.

■ The tax court in the present case found and emphasized the fact that man-

agers of the trust did not exercise any powers beyond those which were necessary incidents to the preservation of trust property, the collection of income therefrom, and its distribution to the beneficiaries. The character of the association is, however, determined from the instrument, and it is no defense to say that the managers did not exercise all the powers set forth in the declaration of trust. Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 373, 56 S.Ct. 285, 80 L.Ed. 278.

■■ It is urged that there is no community of interest among the beneficiaries. With this we cannot agree. They pooled their resources, created a common fund, directed the trustee to operate the common fund for their common benefit as their interests therein appeared, and each owned an undivided interest in the securities purchased in proportion to the amount of money they had placed in the common fund. It is true that if the trustee receives income from the underlying securities, its receipt creates a corresponding indebtedness to the individual beneficiary and that the beneficial interest of the underlying securities was in the beneficiaries. But that is not decisive of the nature of the association. The legal title to the securities was in the trustee and the legal title to the income or profit in the first instance was likewise in the trustee. The moment when the legal title to the income passes to the beneficiaries is immaterial. The title must pass through the trustee. All the trustee ever has in the corpus of an estate or in the income therefrom is the naked legal title. The beneficial interest is always in the beneficiaries. This result flows from the very nature of a trust. The fact that one may have realized a gain and another a loss as a result of a sale of stock because they purchased on a different level does not change the nature of the association. It still is an association in which the beneficiaries join together for the common purpose of realizing profit and gain through the operation of the trust.

Appellant advances the theory that all there is to the arrangement is that the corporation entered into separate contracts with each beneficiary by which it sold its services to them, the main service to them being in enabling them to buy an interest in an approved list of securities. This was not the theory upon which the tax court decided the case, nor are we able to find any case

which has been decided on this ground. Taking this theory at its face value, all the corporation then did was to enable the beneficiaries to become members of an association dealing in a list of approved securities. We are still faced with the necessity of determining the nature and character of that association.

The character of this trust cannot be determined from a single sentence, paragraph or declaration, but must be gleaned from a consideration of the entire instrument. In determining the character of the trust, we must add to the powers of the trustee those of the corporation.[5] Commissioner v. Chase National Bank, supra. The garment in which this trust is clothed makes it difficult to recognize any resemblance to a traditional trust. The trust clearly was engaged in the business of buying and selling securities for income and profit for its members. Its structure, while not identical to that of a corporation, was measurably akin thereto. Being an association in the nature of a corporation, it falls within the provisions of the act and is taxable accordingly.

Reversed and remanded with directions to proceed in accordance with the views expressed herein.

---

[5] Wherever the powers of the trustee are discussed, we refer to the combined powers of the corporation and the trustee.