CRAIG M. SMITH AND RUTH E. SMITH, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65283–65291, 73031–73039. Filed December 9, 1959.

[1] Proceedings of the following petitioners are consolidated herewith: Francis M. Hilby and Laura E. Hilby, Docket No. 65284; Roy W. Longstreet and Ruth E. Longstreet, Docket No. 65285; Lester M. Abbott and Mary Agnes Abbott, Docket No. 65286; Commodity Trading Fund Account of Longstreet-Abbott & Company, Docket No. 65287;

466

Personal Trading Fund Account of Longstreet-Abbott & Company, Docket No. 65288; Commodity Syndicate Account of Longstreet-Abbott & Company, Docket No. 65289; Missouri Group Account of Longstreet-Abbott & Company, Docket No. 65290; Missouri Trading Fund Account of Longstreet-Abbott & Company, Docket No. 65291; Commodity Syndicate Account of Longstreet-Abbott & Company, Docket No. 73031; Commodity Trading Fund Account of Longstreet-Abbott & Company, Docket No. 73032; Missouri Trading Fund Account of Longstreet-Abbott & Company, Docket No. 73033; Personal Trading Fund Account of Longstreet-Abbott & Company, Docket No. 73034; Missouri Group Account of Longstreet-Abbott & Company, Docket No. 73035; F. Martin Hilby and Laura E. Hilby, Docket No. 73036; Craig M. Smith and Ruth E. Smith, Docket No. 73037; Roy W. Longstreet and Ruth E. Longstreet, Docket No. 73038; Lester M. Abbott and Mary Agnes Abbott, Docket No. 73039.

*J. Terrell Vaughan, Esq.*, for the petitioners.
*Robert A. Roberts, Esq.*, for the respondent.

OPINION.

BRUCE, *Judge:* These consolidated proceedings involve deficiencies and additions to tax as follows:

| Docket No. | Petitioner | Year | Deficiencies | | |
|---|---|---|---|---|---|
| | | | Income tax | Additions to tax · | |
| | | | | Sec. 294(d)(1)(B), I.R.C. 1939 | Sec. 294(d)(2), I.R.C. 1939 |
| 65283 | Craig M. Smith and Ruth E. Smith. | 1950 | $1,709.60 | | $96.62 |
| | | 1951 | 10,625.91 | | 625.77 |
| | | 1952 | 8,050.90 | | 514.55 |
| | | 1953 | 9,918.52 | $4.00 | 1,202.29 |
| 65284 | Francis M. Hilby and Laura E. Hilby. | 1950 | 2,057.40 | | 133.88 |
| | | 1951 | 16,665.18 | | 999.51 |
| | | 1952 | 11,134.46 | | 727.48 |
| | | 1953 | 13,181.86 | 37.50 | 1,581.14 |
| 65285 | Roy W. Longstreet and Ruth E. Longstreet. | 1950 | 19,721.15 | | 1,100.97 |
| | | 1951 | 196,955.34 | | 11,885.07 |
| | | 1952 | 77,153.80 | | 4,487.60 |
| | | 1953 | 105,779.89 | 79.68 | 8,594.36 |
| 65286 | Lester M. Abbott and Mary Agnes Abbott. | 1950 | 4,192.52 | | 264.25 |
| | | 1951 | 26,841.92 | | 1,575.62 |
| | | 1952 | 18,398.20 | | 1,221.15 |
| | | 1953 | 17,069.74 | | 2,102.77 |
| 65287 | Commodity Trading Fund Account of Longstreet-Abbott & Company. | 1953 | 3,820.71 | | |
| 65288 | Personal Trading Fund Account of Longstreet-Abbott & Company. | 1953 | 53,363.41 | | |
| 65289 | Commodity Syndicate Account of Longstreet-Abbott & Company. | 1953 | 36,375.50 | | |
| 65290 | Missouri Group Account of Longstreet-Abbott & Company. | 1953 | 26,493.41 | | |
| 65291 | Missouri Trading Fund Account of Longstreet-Abbott & Company. | 1953 | 831.14 | | |
| 73031 | Commodity Syndicate Account of Longstreet-Abbott & Company. | 1954 | 18,394.21 | | |
| 73032 | Commodity Trading Fund Account of Longstreet-Abbott & Company. | 1954 | 2,097.11 | | |
| 73033 | Missouri Trading Fund Account of Longstreet-Abbott & Company. | 1954 | 1,029.54 | | |
| 73034 | Personal Trading Fund Account of Longstreet-Abbott & Company. | 1954 | 41,542.96 | | |
| 73035 | Missouri Group Account of Longstreet-Abbott & Company. | 1954 | 19,424.45 | | |
| 73036 | F. Martin Hilby and Laura E. Hilby. | 1954 | 18,777.37 | | |
| | | 1955 | 2,467.29 | | |
| 73037 | Craig M. Smith and Ruth E. Smith. | 1954 | 11,039.94 | | |
| | | 1955 | 2,014.32 | | |
| 73038 | Roy W. Longstreet and Ruth E. Longstreet. | 1954 | 132,929.32 | | |
| | | 1955 | 9,703.07 | | |
| 73039 | Lester M. Abbott and Mary Agnes Abbott. | 1954 | 22,284.42 | | |
| | | 1955 | 3,187.09 | | |

After concessions by both parties,[2] the issues remaining for decision are as follows:

(1) Are the Funds in Docket Nos. 65287 through 65291, and 73031 through 73035, associations taxable as corporations?

[2] Including a concession by respondent that the assessment and/or collection of the deficiencies for 1950 in Docket Nos. 65283 through 65286 are barred by the statute of limitations.

(2) Did the Funds realize ordinary income or loss rather than capital gain or loss from their purchases and sales of commodity futures and spot commodities?

(3) Did the partnership of Longstreet-Abbott & Company (LACO) and, therefore, the partners (petitioners in Docket Nos. 65283 through 65286 and 73036 through 73039) realize ordinary income rather than capital gains from LACO's management of the commodity trading accounts of the six Funds during the taxable years 1951 through 1955?

(4) Did the partners composing LACO realize ordinary income rather than capital gains from their individual participation through personal investment in one or more of the six Funds during the taxable years 1951 through 1955?

(5) Did LACO and therefore the partners composing LACO sustain a deductible loss by reason of the net losses reported by the six Funds in 1955?

(6) Did the partners composing LACO sustain a loss in 1955 by reason of their individual participation through personal investment in one or more of the six Funds?

(7) Did LACO and therefore the partners composing LACO realize ordinary income rather than capital gains from LACO's management of commodity trading accounts for individuals during the taxable years 1951 through 1955?

(8) Did LACO and therefore the partners composing LACO sustain a deductible loss by reason of the net losses reflected in individual trading accounts during the taxable years 1951 through 1955?

(9) Did Roy W. Longstreet (Docket Nos. 65285 and 73038), a partner in LACO, realize ordinary income rather than capital gains from certain accounts in the Personal Trading Fund Account of LACO during the taxable years 1951 through 1955?

(10) Are the individual partners (Docket Nos. 65283 through 65285) liable for additions to tax pursuant to section 294(d)(1)(B), I.R.C. 1939? [3]

(11) Are the individual partners (Docket Nos. 65283 through 65286) liable for additions to tax pursuant to section 294(d)(2)?

The decisions on some of the above issues will also determine the allowable amount of medical expense deductions available to the petitioners in Docket Nos. 65283, 73036, 73037, and 73039.

The facts have been fully stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference.

Craig M. Smith, Roy W. Longstreet, Lester M. Abbott, and F. Martin Hilby and their respective wives filed joint individual income

---

[3] Unless otherwise indicated all section references are to the Internal Revenue Code of 1939.

tax returns for each of the calendar years 1951 through 1955. The returns for 1951 were filed with the collector of internal revenue for the First District of Missouri; for 1952 with the director of internal revenue, St. Louis, Missouri; and for 1953, 1954, and 1955 with the district director of internal revenue at St. Louis, Missouri.

During the years involved Longstreet, Abbott, Smith, and Hilby were partners in the partnership of Longstreet-Abbott & Company, hereinafter referred to as LACO. The purposes of the partnership as stated in the partnership agreement were as follows:

A. To engage in the business of commodity trading; that is to say, the buying and selling of commodity futures for themselves and for themselves and others under contracts of joint adventure;

B. To practice the profession of commodity counselling; that is to say, advising others on problems that arise from fluctuations in commodity prices;

C. To engage in other activities that may be expedient in carrying out the foregoing purposes.

At all times pertinent LACO engaged in the following activities:

(a) Hedging for industrial clients in commodity futures.

(b) Counseling clients on trends in raw material prices.

(c) Furnishing periodic literature to subscribers on price trends in commodity markets.

(d) Buying and selling commodity futures and spot commodities on its own account.

(e) Buying and selling commodity futures and spot commodities for others in individual trading accounts, each managed independently by LACO. Purchases and sales were made in the names of the individual investors.

(f) Buying and selling commodity futures and spot commodities for participants in six Funds, each of which was managed independently by LACO for those who furnished the capital for such purposes. All expenses incurred in the management of the Funds and individual trading accounts were absorbed by LACO.

### Facts Relating to the Funds.

The six Funds managed by LACO during the years in issue were:

Commodity Trading Fund Account of Longstreet-Abbott & Company.
Commodity Syndicate Account of Longstreet-Abbott & Company.
Personal Trading Fund Account of Longstreet-Abbott & Company.
Missouri Group Account of Longstreet-Abbott & Company.
Missouri Trading Fund Account of Longstreet-Abbott & Company.
Missouri Long Term Fund Account of Longstreet-Abbott & Company.

Five of the Funds managed by LACO are petitioners in these proceedings. Missouri Long Term Fund Account of Longstreet-Abbott & Company is not a petitioner. The Funds filed partnership income tax returns for the calendar years 1953 and 1954 (the only

years in issue in respect to these petitioners) with the district director of internal revenue, St. Louis, Missouri. Partnership income tax returns were also filed by the Funds for the calendar years 1951, 1952, and 1955.

LACO published several pamphlets designed to attract individuals to invest in one of the Funds managed by LACO, or to open an individual trading account managed by LACO. Individuals from throughout the United States invested in the Funds managed by LACO. An individual became a participant of any one of the Funds by executing an instrument entitled, "Contract of Participation." The provisions of this contract were substantially identical for each Fund, and a sample contract follows:

CONTRACT OF PARTICIPATION

COMMODITY TRADING FUND

LONGSTREET-ABBOTT & COMPANY
7 North Brentwood Blvd.
St. Louis 5, Missouri

Dear Sirs:

I understand that the Commodity Trading Fund is under your management and that the capital in the Fund is used as margin for the purchase and sale of commodity futures in a joint venture between "Cash Participants", who furnish the capital, and your firm which devotes its time, experience, and research, and office facilities, at its own expense, to the planning and making of trades for the account of the Fund.

I am willing to become a Cash Participant on the terms stated below and on the reverse side:

1. I will deposit in the Fund the sum of_____

Dollars. ($_____). I may increase my deposits at any time in multiples of $100.00, subject to the approval of your firm. I may reduce my deposits as provided in Paragraph 6. The net amount, exclusive of profits and losses, will be known as my investment.

2. Each Cash Participant will be a co-owner with your firm of all commodity futures acquired for the account of the Fund. For convenience, however, all trades in such futures shall be carried in the name of your firm for the account of the Commodity Trading Fund. In determining the trades to be made you shall have full discretion.

3. Brokerage charges and commissions shall be subtracted from the profit or added to the loss to determine the net profit or loss on each trade closed. You will maintain a record of net profits and losses by (a) bi-monthly accounting periods and (b) "periods of cumulation" each ending on a December 31st when the net profits exceed the net losses on trades closed during the period.

4. On each trade closed in any bi-monthly accounting period, you will determine that part of the net profit or loss which is proportionate to my investment in the Fund as of the time the trade was opened. My share of such part will be 50% if my investment was less than $10,000.00, or otherwise 60%, and your share will be the balance, except as provided by paragraph G, on the reverse side in case of termination.

5. At the end of each bi-monthly accounting period you will report to me (a) my share of the profits and losses on trades closed during such period, and

(b) my credit balance, meaning the amount of my investment less my share of losses and plus my share of unwithdrawn profits.

6. Subject to Paragraph G you will pay to me out of the Fund account such portion of my credit balance as I may request; provided that you shall not be required to return more than 50% of my capital within less than 30 days.

7. Likewise, you may at any time withdraw your share of the profits, provided as follows:

(a) If as of the end of any bi-monthly accounting period the losses exceed the profits for the period of cumulation then current, you shall restore to the Fund so much as you may have withdrawn from your share of the said profits.

(b) If as of the end of any calendar year your share of the losses exceeds your share of the profits for the current period of cumulation, then so long as that continues to be the case and to the extent of the excess you shall refrain from withdrawing any profits credited to you under these terms or under any other participant's contract with regard to the Fund.

8. Termination of our contract shall be governed by Paragraph G on the reverse side and in such case Paragraphs 6 and 7 shall not apply. The contract may not be assigned or otherwise transferred except as provided in Paragraphs H and I.

*      *      *      *      *      *      *

## ADDITIONAL TERMS

A. The capital and unwithdrawn profits of the Fund will be held, except as provided below, in the "Commodity Trading Fund Account" of Longstreet-Abbott & Company at a bank selected by your firm. You will notify me of the name and location of the bank.

B. The Account may be drawn on only by check signed by at least two members of your firm and shall be used exclusively for the purposes herein specified.

C. You may supply from the Account such margin as Brokers require on trades made through them for the benefit of the Fund. You shall instruct the Brokers to hold the said margin in an account also designated "Commodity Trading Fund Account" of Longstreet-Abbott & Company, and further, to hold in the said account all moneys due the Fund until you direct the return of the same.

D. As of the end of each calendar year, you will make a report to me showing my net profit or loss for the year on closed trades, and, for the purposes of income tax returns, the division of the same into long and short term profits and losses.

E. I or my Agent may on any Saturday examine your books and records insofar as they concern the computation of my share of profits and losses.

F. Your firm or any member thereof may be a Cash Participant in the Fund.

G. This contract may be terminated by either party, with or without cause, but subject to the following provisions:

(1) The party choosing to terminate must give the other written notice to that effect.

(2) The last day of the month prior to the month in which such notice is given, if given during the first eleven days of the month, or otherwise the last day of the month in which the notice is given, will be regarded as the date of liquidation. I shall be considered as having participated in trades opened before, but not in trades opened after, the date of liquidation.

(3) Within seven days after the day on which such notice is given you shall return to me my credit balance, calculated in accordance with the following

rules; provided that you may have thirty days from that day in which to return fifty per cent (50%) of my capital.

(4) For the purposes of the following rules, the net losses or profits on separate trades shall be dealt with in the order in which the corresponding trades were opened, except that those on closed trades shall be dealt with first.

(5) As of the date of liquidation you shall compute the net profit or loss on each trade closed during the period of cumulation then current and on each trade then unclosed.

(6) For such purpose each unclosed trade shall be treated as if closed at the last price quoted on the date of liquidation or, at your option, the price established by the first trade that you are able to make, in the same future, after the date of liquidation.

(7) If the net profits exceed the net losses on closed and unclosed trades combined, whatever the result in each class taken separately, then:

a. On each closed trade the net profit or loss shall be apportioned between us in accordance with Paragraph 4.

b. If on unclosed trades taken separately the net losses exceed the net profits, you shall apportion to me my share of each such profit or loss in accordance with Paragraph 4, and the unclosed trades shall thereafter be for your account.

c. If on unclosed trades taken separately the net profits exceed the net losses, sub-paragraph (9) shall apply.

(8) If the net losses exceed the net profits on closed and unclosed trades combined, whatever the result in each class taken separately, then:

a. The net losses shall be charged against the net profits.

b. The remainder of the net losses shall be charged to me, to the extent of my investment.

c. If on closed trades any net losses then remain uncharged, they shall be charged to you.

d. If on unclosed trades taken separately the net losses exceed the net profits, the unclosed trades shall thereafter be for your account.

e. If on unclosed trades taken separately the net profits exceed the net losses, sub-paragraph (9) shall apply.

(9) If on unclosed trades the net profits exceed the net losses, then when all the said trades are closed the net profits and losses actually realized upon them shall be treated as follows:

a. The net losses shall be charged against the net profits.

b. The remainder of the net profits shall be paid to me, to the extent of all net losses that may have been charged to me under sub-paragraphs (7) or (8).

c. What then remains of the net profits shall be apportioned between us in accordance with Paragraph 4.

d. If the net losses exceed the net profits, the excess shall be charged to you.

H. In the event of my death, my legal representative or representatives may give you notice of termination, provided that if a "Survivor Clause" is included after Paragraph I, the survivor may allow the contract to remain in force or may give you notice of termination.

I. In case of the death or withdrawal of any of the members of your firm: (1) the living members, acting nevertheless as partners, shall immediately notify me of the fact and shall have the authority to close any open trades; (2) this contract, subject to the right of termination, shall remain in effect—

a. Between me and the partners who continue to engage as such in commodity trading, or

b. between me and such of them as I shall designate, and in such event my credit balance less my losses shall be transferred to the partner so designated, to be held in a fund and bank and brokerage accounts bearing such names as he shall select.

Each participant made a minimum investment of $1,000 or $5,000 depending upon the particular Fund in which he was investing. The investments were delivered to LACO and deposited by LACO in the bank account of the Fund involved. The capital invested by participants in the Funds was used as margin for the purpose of trading in commodity futures and spot commodities. LACO furnished no moneys of its own for this purpose.

At all times pertinent each Fund maintained separate bank accounts, separate brokerage accounts, and separate records. The trading policies of the Funds varied, ranging from aggressive to conservative, and the Funds engaged in no hedging operations. The activities of the Funds were limited to trading in commodity futures and spot commodities through brokers on the various commodity exchanges, and the Funds did not maintain inventories of such commodity futures or spot commodities for sale.

During 1953 and 1954 approximately 30 to 100 investors, including Longstreet, Abbott, Smith, and/or Hilby, participated in each of the Funds. Neither the withdrawal nor the addition of a participant in any Fund terminated the existence of the Fund.

In its income tax return each Fund was described as a "Joint Venture-Grain Trading." Gains and losses from grain trading were reported as capital gains and losses. Respondent determined that the Funds were associations taxable as corporations and that they realized ordinary income or loss rather than capital gain or loss from their purchase and sale of commodity futures and spot commodities. Respondent further determined that the respective net amounts paid by each Fund to LACO were deductible by the Funds as having been paid "for services rendered in managing the business of the association(s)."

For the calendar years 1951 through 1955 LACO reported its share of the profits and losses from the Funds, with the exception of a small amount of interest income, as capital gains and losses. The partners composing LACO reported their respective shares of LACO's profits and losses on the same basis. For the years 1951 through 1954 in which each of the Funds realized a net profit, respondent determined that the profits and losses were ordinary income and loss to both LACO and the partners. Respondent further determined that in 1955 when the Funds suffered net losses, neither LACO

nor the partners realized net losses and disallowed their deductions accordingly.

Longstreet, Abbott, Smith, and Hilby and/or their wives each participated in one or more of the above-mentioned Funds. Each reported his share of the profits and losses of the Funds as capital gains and losses, with the exception of the interest income. Respondent determined that, since the Funds were associations taxable as corporations, the amounts distributed to these individuals during 1951 through 1955 were dividends reportable as ordinary income. For the same reason respondent determined that the net losses suffered by the Funds during 1955 were not realized by the individuals, and disallowed their deductions accordingly.

*Facts Relating to Individual Trading Accounts Managed by LACO.*

An investor started an individual trading account to be managed by LACO by executing five documents. The documents included an agreement with LACO concerning the terms under which LACO managed the account, a document granting LACO a power of attorney and other papers required by LACO to trade in the account. The terms of the agreement between the individual investor and LACO follow:

### AGREEMENT FOR AN INDIVIDUAL TRADING ACCOUNT

The parties to this contract are_____ _____
(Name)

_____, hereinafter referred to as the
(Address)

Cash Participant, whether one or more, and Longstreet-Abbott & Company, a partnership doing business at 7 North Brentwood Boulevard, Clayton 5, Missouri, hereinafter referred to as the Partnership.

For the purpose of trading in commodity futures and spot commodities the Cash Participant and the Partnership enter into a joint venture on the following terms:

1. For such purpose, the Cash Participant will deposit with such brokerage firm or firms as the parties hereto may agree upon, such capital amounts as may be required by the Partnership, provided that at no time will the sum of the capital amounts on deposit exceed

_____Dollars ($_____).

2. The Cash Participant and the Partnership shall be co-owners of all commodity futures and spot commodities acquired under this contract. For convenience, however, the deposit with each broker and all trades made therewith will be carried with such broker in an account to be identified by the name of the Cash Participant and by a distinctive number assigned by the Partnership. All such accounts are herein referred to as accounts of the venture.

3. The Cash Participant will issue to the Partnership a power of attorney in respect of each such account, giving the Partnership authority to use the capital in said account as margin for buying and selling commodity futures and spot commodities for the account from the effective date of this contract to the

termination thereof, the profits and losses to be shared as stated below. The Cash Participant will furnish to the broker holding such account a signed copy of the said power of attorney.

4. The Partnership shall have complete discretion in determining the trades to be made for the venture. It shall, at its own expense, devote so much of its time, experience, research and office facilities as may be reasonably necessary to the planning and making of said trades and shall issue to the brokers selected by the parties such orders as may be required in order to transact them.

5. All charges and commissions of brokers, warehousemen, carriers, and insurors incident to each closed trade, and all interest on loans on spot commodities in connection therewith, to the extent that any of these shall have been earned, shall be subtracted from the profit or added to the loss to determine the net profit or loss on each such trade.

6. The Partnership will maintain a record of net profits and losses by (a) calendar quarters and (b) "periods of cumulation" each ending on a December 31st when the net profits exceed the net losses on trades closed during the period. The difference between the sum of the net profits and the sum of the net losses, on trades closed during any calendar quarter or any period of cumulation, will be known as the net profit or loss for such quarter or period.

7. The books of the venture shall be so adjusted as of the close of each calendar quarter that the net profit or loss for the period of cumulation then current will have been credited or charged as follows: 60% to the Cash Participant and 40% to the Partnership; provided that on termination of this contract Paragraph 10 shall apply.

8. The parties may draw upon their respective shares of the net profit as currently determined for any period of cumulation, provided as follows:

(a) If the Cash Participant shall have withdrawn, out of profits for the period, more than his share of the net profit as currently determined for the period, he shall restore the excess.

(b) If at any time during the period the Partnership shall previously have withdrawn, out of profits for the period, more than one-half of its share of the net profit as currently determined for the period, the Partnership shall restore the excess.

(c) If at the end of any period of cumulation there is a net loss on open trades, treated in accordance with sub-paragraph (d) below, the Partnership shall, to the extent of the loss, refrain from withdrawing the balance of its share of the profits for the period until the end of the first calendar month thereafter when there is a net profit for the current period of cumulation to date, taking both closed and open trades into account; provided that this rule shall not apply to any period during or at the end of which this contract is terminated.

(d) For the purpose of the rule stated in sub-paragraph (c) open trades shall be treated as if closed at the last price published before the end of the period of cumulation to which such rule applies, provided that the price applied shall pertain to a commodity of the same description, to the same delivery month in the case of a commodity future, and to a trade at the nearest terminal market in the case of a spot commodity.

9. A trade is to be deemed entered when a commodity future or spot commodity is acquired; as open during ownership of the future or commodity; and as closed when the future is liquidated or the commodity is sold.

10. This contract may be terminated by either party at any time without cause, subject to the following provisions:

(a) The party choosing to terminate shall give the other written notice to that effect.

(b) All open trades shall then be closed.

(c) If there is a net profit for the period of cumulation to the date of termination, the Cash Participant's share shall be computed in accordance with Paragraph 7.

(d) If there is a net loss for such period, it shall be charged to the Cash Participant to the extent of the dollar amount specified in Paragraph 1 and the balance shall be charged to the Partnership, settlement then to be made between the parties accordingly.

The account with the broker was carried in the investor's name, and all business in the account was conducted in the investor's name. LACO would not manage an account unless the investor would commit a minimum of $50,000 as margin. However, the individual investor deposited with the broker only that portion of his total commitment currently required by the broker for margin in trading in the account. LACO's experience had been that approximately 60 per cent of the investor's commitment would be required on deposit with a broker at any one time for margin. LACO's trading policy (i.e., aggressive, conservative, etc.) varied with each account, depending upon the particular needs of each individual investor.

LACO, through its publications and by other means, attracted investors from throughout the United States. During the years in issue LACO managed as many as 136 individual trading accounts involving investors from 26 States and England. Within each tax year some of the trading accounts prospered and some suffered losses.

LACO reported its share of the gains and losses from the individual trading accounts as capital gains and losses from partnerships. The individual LACO partners likewise reported their respective portions of LACO's share of the gains and losses from the individual trading accounts as capital gains and losses. Respondent determined that LACO's and the partners' income from the management of the individual trading accounts represented compensation for personal services and was therefore ordinary income rather than capital gain. Respondent further determined neither LACO nor the partners realized any loss during the years involved by reason of the net losses reflected in the accounts of some of the individual investors, and disallowed deductions accordingly.

*Facts Relating to Longstreet.*

Pursuant to the terms of the LACO partnership agreement, Longstreet had special rights to profits realized from commodity trading accounts of individuals with whom he had dealt prior to the formation of LACO. The terms of this agreement follow.

ARTICLE XIV. COMMODITY TRADING FUNDS: PROFIT AND LOSS: SPECIAL RIGHTS OF LONGSTREET

It is contemplated that the Partnership and Longstreet as an individual will separately enter into profit sharing contracts with other persons, hereinafter designated as cash participants, under which the cash participants will furnish capital to be placed in funds called commodity trading funds, for use as margin in commodity trading. The cash participants are expected to include certain persons who are named in a list of which a copy, signed by all the partners, is held by each partner. If these persons become cash participants, Abbott and Smith grant that they will do so because of their prior dealings with Longstreet and the good will they bear him.

Accordingly Abbott and Smith agree that Longstreet shall be entitled to make contracts of the foregoing description for his private account with the persons so listed, and Longstreet agrees that all such contracts made by him with other persons shall be made on behalf of the Partnership. The partnership shall not be a party to Longstreet's said private contracts, shall have no responsibility in connection therewith, and shall share none of the profits and bear none of the losses from trading under the same.

If any cash participant who is party to such a contract with Longstreet shall elect to enter into a like contract with the Partnership, Longstreet shall be entitled to all the net profits, and shall bear all the net losses distributable to the Partnership under the latter contract; provided that if the aggregate capital then invested under the two contracts exceeds the total of the sums shown opposite the names of the cash participants in the above-mentioned list, then that part of the said net profit or net loss which is proportionate to the excess shall be treated and distributed under article XVI below.

During the years in issue Longstreet realized profits from certain accounts pursuant to the terms of the above agreement. These accounts were all a part of the Personal Trading Fund Account of Longstreet-Abbott & Company. Longstreet reported these gains as capital gains. Respondent determined that the income was compensation for personal services and therefore ordinary income instead of capital gains.

### Facts Relating to Additions to Tax.

Declarations of estimated tax were due from Longstreet, Hilby, and Smith and their respective wives on Friday, January 15, 1954. Hilby's and Smith's declarations were received by the director of internal revenue, St. Louis, on January 18, 1954. Longstreet's declaration was received by the same district director on January 19. Respondent determined additions to tax under section 294(d)(1)(B) for 1953 against these three petitioners.

Based upon his determinations of additional income for the reasons above mentioned, respondent further determined that Smith, Hilby, Longstreet, and Abbott were subject to additions to tax pursuant to section 294(d)(2) for the years 1950 through 1953, on the ground that 80 per cent of each petitioner's tax for each year involved, as recomputed by respondent, exceeds the petitioner's estimated tax.

## Issues Relating to the Funds.

We are first asked to decide whether the Funds were associations taxable as corporations or were partnerships during the years 1951 through 1955. The pertinent provisions of the Internal Revenue Codes of 1939 and 1954, and related regulations, applicable to the years in question are substantially identical,[4] and for simplicity we shall refer to and quote only portions of section 3797(a), I.R.C. 1939, and Regulations 118, section 39.3797. At section 3797(a)(2) the terms "partnership" and "partner" are defined as follows:

> The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

The term "corporation" is defined at section 3797(a)(3) as follows: "The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The statutory definitions quoted above are couched in broad, general terms, and accordingly shed little light in indicating how a *specific* business entity will be taxed. However, Congress intended to establish within the specific language of the statute only the touchstones upon which to determine whether an entity is an association on the one hand or a partnership on the other. It is self evident that an attempt by Congress to classify as partnerships or associations the innumerable types of business entities man's ingenuity is capable of creating would have been an impossible task. Through numerous court decisions, however, there have been developed guideposts establishing the fundamental distinctions between partnerships and associations taxable as corporations. Many of these distinctions have been incorporated in Regulations 118, section 39.3797, significant portions of which are set forth below.

> Sec. 39.3797-1 *Classification of taxables.* For the purpose of taxation the Internal Revenue Code makes its own classification and prescribes its own standards of classification. Local law is of no importance in this connection. * * * The term "partnership" is not limited to the common law meaning of partnership, but is broader in its scope and includes groups not commonly called partnerships. * * * The term "corporation" is not limited to the artificial entity usually known as a corporation, but includes also an association, a trust classed as an association because of its nature or its activities, a joint-stock company, an insurance company, and certain kinds of partnerships. * * *

---

[4] Section 3797(a), I.R.C. 1939; sec. 7701(a), I.R.C. 1954; Regs. 111, sec. 29.3797; Regs. 118, sec. 39.3797.

Sec. 39.3797-2 *Association.* The term "association" is not used in the Internal Revenue Code in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity. It is immaterial whether such organization is created by an agreement, a declaration of trust, a statute, or otherwise. It includes a voluntary association, a joint-stock association or company, a "business" trust, a "Massachusetts" trust, a "common law" trust, an interinsurance exchange operating through an attorney in fact, a partnership association, and any other type of organization (by whatever name known) which is not, within the meaning of the Code, a trust or an estate, or a partnership. * * *

\*      \*      \*      \*      \*      \*      \*

Sec. 39.3797-4 *Partnerships.* (a) The Internal Revenue Code provides its own concept of a partnership. Under the term "partnership" it includes not only a partnership as known at common law, but, as well, a syndicate, group, pool, joint venture, or other unincorporated organization which carries on any business, financial operation, or venture, and which is not, within the meaning of the Code, a trust, estate, or a corporation. On the other hand the Code classifies under the term "corporation" an association or joint-stock company, the members of which may be subject to the personal liability of partners. If an organization is not interrupted by the death of a member or by a change in ownership of a participating interest during the agreed period of its existence, and its management is centralized in one or more persons in their representative capacities, such an organization is an association, taxable as a corporation. * * *

(b) The following examples will illustrate some phases of the distinctions described in paragraph (a) of this section:

\*      \*      \*      \*      \*      \*      \*

(2) A, B, and C contribute $10,000 each for the purpose of buying and selling real estate. If A, B, C, or D, an outside party (or any combination of them as long as the approval of each participant is not required for syndicate action), takes control of the money, property, and business of the enterprise, and the syndicate is not terminated on the death of any of the participants, the syndicate is classified as an association.

The opinion of the Supreme Court in *Morrissey* v. *Commissioner*, 296 U.S. 344 (1955)[5] is perhaps the most significant and enlightening court decision relevant to the issue before us. While the *Morrissey* case involved an organization assuming the form of a trust, the indicia of an "association" are clearly defined and are noteworthy. The Court observed—

"Association" implies associates. It implies the entering into a joint enterprise, * * * for the transaction of business. * * *

\*      \*      \*      \*      \*      \*      \*

The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to features distin-

[5] See also *Swanson* v. *Commissioner,* 296 U.S. 362; *Helvering* v. *Combs,* 296 U.S. 365; *Helvering* v. *Coleman-Gilbert Associates,* 296 U.S. 369; *Nelson Co.* v. *Helvering,* 296 U.S. 374.

guishing associations from partnerships as well as from ordinary trusts. * * * While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive. * * * It cannot be considered to be essential to the existence of an association that those beneficially interested should hold meetings or elect their representatives. * * * the test of an association is not to be found in the mere formal evidence of interests or in a particular method of transfer.

The Court then outlined the "salient features" of a corporation which if inherent in the structure of another organization would cause it to be classified as an association:

A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. * * * Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. * * * [A corporation is] secure from termination or interruption by the death of owners * * * [and] facilitates * * * the transfer of * * * interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. [It] * * * also permits the limitation of the personal liability of participants to the property embarked in the undertaking.

With the above principles in mind we have carefully sifted and weighed the evidence in the instant case. The Funds in question have many of the characteristics of a partnership on the one hand and of a corporation on the other, and consequently, our decision has been a difficult one. However, we believe the preponderance of the evidence compels the conclusion that the Funds were associations taxable as corporations.

The Funds in question have virtually all of the "salient features" of a corporation as outlined in *Morrissey* v. *Commissioner, supra.*

The Funds were organized to provide a medium whereby numerous individual investors could pool their resources for the purpose of actively and continuously trading in commodity futures and spot commodities. Thus, through the Funds there has been an association of individuals for the purpose of conducting an active and continuous business for a profit. See *Investment Trust of Mutual Investment Co.*, 27 B.T.A. 1322, affd. 71 F. 2d 1009 (C.A. 2, 1934). Also see and compare *Commissioner* v. *Chase National Bank*, 122 F. 2d 540 (C.A. 2, 1941), with *Commissioner* v. *North American Bond Trust*, 122 F. 2d 545 (C.A. 2, 1941), certiorari denied 314 U.S. 701. The commodity trading accounts were in the names of the various Funds, not in the names of the investors. Centralization of management was achieved by giving LACO absolute power to manage the Funds' accounts, and by requiring LACO to maintain books and records of the Funds' activities. Each Fund had an indefinite lifespan, and its existence was not affected by the death of any of the interested parties. It is true that an individual investor's interest in a Fund was not

transferable except through a "survivor clause" optionally included in the contract. However, in a sense, transfers did occur when individuals terminated their interests in a Fund and new investors filled the gap by becoming participants in the Fund, thus leaving the continuity of operations unaffected. Furthermore, the Funds were "open end" organizations, that is, additional participants could be granted admission at the discretion of LACO. Thus another "salient feature" of a corporation is present, i.e., a means of introducing large numbers of participants without upsetting the basic structure of the organization.

Petitioners point out that there is no limited liability and thus an important corporate characteristic is lacking. If we conceive of the association being composed solely of the individual investors, who, in effect, contracted with LACO for a centralized management and for the assumption of liability above their cash contributions in return for a percentage of the profits, then limited liability did in fact exist. However, if LACO must be included as an "associate," then we agree with petitioners that true limited liability did not exist, and that there was only an allocation of liability between the individual investors and LACO. In either event, the presence or absence of limited liability is not a conclusive factor, but is only one of many guideposts to be considered. *Nee* v. *Main Street Bank*, 174 F. 2d 425 (C.A. 8, 1949), certiorari denied 338 U.S. 823.

In reaching our decision we have observed that none of the Funds had the formal characteristics of a corporation; that individual investors could terminate their interests at will and could, within certain limitations, withdraw their profits at will; that the liability of LACO was not limited; that interests in the Funds were not truly transferable; that the method of splitting profits resembled that utilized in a partnership; and that the parties characterized their enterprise as a "joint venture." However, as the Supreme Court observed in *Morrissey, supra*, only a resemblance to a corporation is required, not identity. Moreover, the classification is based upon the substantive characteristics of the Funds, not upon their formal characteristics nor upon the expressed intentions of the parties.

Petitioners have placed great emphasis and reliance upon the principles of *Commissioner* v. *Culbertson*, 337 U.S. 733 (1949), and similar cases, in an effort to establish that the Funds were partnerships. While the *Culbertson* case is helpful in defining a partnership, it should be noted that the issue in the *Culbertson*-type case is whether two or more persons *joined together* in a business venture. In *Morrissey* and in the instant case the question is not whether two or more persons joined together in a business venture, but rather, *what kind of business entity* did the parties form to conduct the business venture.

The issue before the Court is a fact question, and lengthy discussion of numerous additional cases cited by petitioners would serve little purpose. Suffice it to say that petitioners themselves have stated that, "the facts of the instant case are most unique." The cases cited by petitioners [6] as "bearing an analogy to the instant situation" all involved ventures seriously lacking in the "salient features" of a corporation and bearing only a remote resemblance to the Funds in question.

Petitioners' final contention is that the term "association" is not defined in the Internal Revenue Code and therefore the provisions including associations in the definition of "corporation" are indefinite, uncertain, vague, and incapable of understanding. Petitioners urge that for this reason the taxing of associations as corporations is unconstitutional and constitutes a deprivation of property without due process of law, citing the fifth amendment to the Constitution of the United States. We need dwell upon this contention only long enough to state that it was considered and rejected by the Supreme Court in *Burk-Waggoner Oil Assn.* v. *Hopkins*, 269 U.S. 110.

The next issue is whether the Funds realized ordinary income or loss rather than capital gain or loss from their purchases and sales of commodity futures and spot commodities. Respondent contends that the sole business activity of each Fund was the purchase and sale of commodity futures and spot commodities, and that the resulting gains and losses arose from the everyday operation of the Fund's business and should therefore be considered ordinary income and loss. Respondent relies on *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46 (1955), as authority for his position.

We do not understand respondent to be contending that spot commodities and commodity futures are not, as a general rule, capital assets. In any event, such a contention would be erroneous. *Commissioner* v. *Covington*, 120 F. 2d 768 (C.A. 5, 1941); *Tennessee Egg Co.*, 47 B.T.A. 558; *Corn Products Refining Co.* v. *Commissioner*, *supra*; G.C.M. 17322, XV-2 C.B. 151. Rather, the crux of respondent's position seems to be that since commodity trading is the sole business activity in which the Funds engage, the commodity futures and spot commodities are not capital assets. In our opinion neither the statute nor *Corn Products* is authority for respondent's position.

Both section 117(a)(1), I.R.C. 1939, and section 1221, I.R.C. 1954, provide that the term "capital assets" includes property held by a taxpayer "(whether or not connected with his trade or business)." Moreover, since the property in question certainly is not property subject to an allowance for depreciation; nor a copyright, etc.; nor

---

[6] *Darol Trading Account,* 34 B.T.A. 837; *E. G. Wadel,* 44 B.T.A. 1042; and two Memorandum Opinions of this Court.

an obligation of the United States or any of its possessions, etc.; there is only one possible exception which would exclude the commodity futures and spot commodities from being classified as capital assets. That is, if the commodity futures and spot commodities were "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The parties have stipulated that the above is not the case:

18. All activities for the "fund" petitioners have been in commodity futures and/or spot commodities, and all such activities have been handled through brokers on the various commodity futures exchanges. All commodity futures which have been acquired or closed for the "fund" petitioners have been acquired or closed on the exchanges, and the various "fund" petitioners have maintained no inventory of such commodity futures or spot commodities for sale to any person, firm, or corporation.

*Corn Products* certainly offers little comfort to respondent. The Supreme Court was dealing with gains and losses arising out of hedging operations, and in its opinion quite clearly restricted the applicability of its ruling to hedging operations. In the instant case the parties have stipulated that, " 'Fund' petitioners engaged in no hedging operations during the years 1951 to 1955, inclusive."

In our opinion, *Faroll* v. *Jarecki*, 231 F. 2d 281 (C.A. 7, 1956), certiorari denied 352 U.S. 830, contains an issue analogous to the issue presently under consideration. The *Faroll* case is somewhat unusual in that the *taxpayer*, citing *Corn Products*, was requesting that the commodity futures not be considered capital assets. We shall quote directly a portion of the facts.

Each week-day during 1943 the Chicago Board of Trade (hereinafter sometimes called the "Exchange"), opened at 9:30 A.M. and closed at 2 P.M. On Saturdays it was open from 9:30 A.M. to noon. Except for vacations, illnesses and trips out of the city, the Taxpayer was personally present on the floor of the Exchange on each day the Exchange was open, during all of the hours it was open, for the sole purpose of buying and selling commodity futures on his own behalf. When not on the floor of the Exchange, he devoted his remaining working time to research and other activities related to his tradings or dealings on the Exchange except for occasional and brief consultations with the partners and employees of his partnership concerning the brokerage business of that firm. Such consultations were limited to important managerial questions and at no time during 1943 or at any other time material hereto did the Taxpayer devote any substantial amount of time to the operations of the partnership of which he was a member. The *Taxpayer did not buy or sell commodity futures as hedges nor was the Taxpayer a farmer, producer, miller, operator of a grain elevator or warehouse, or a processor in any other manner of grains*. The Taxpayer was personally present on the floor of the Exchange, buying and selling commodity futures, as aforesaid, not less than 248 of the days on which the Exchange was open for business during the year 1943.

During 1943 the Taxpayer, in more than 10,000 separate transactions, personally bought and sold as the principal, on his own account, commodity futures involving almost 81,000,000 bushels of grain at prices amounting, in the aggregate, to more than $84,000,000. He averaged, at a minimum, 41 separate transactions, over 360,000 bushels of grain and over $340,000 of commitments per day. The only persons permitted to buy and sell commodity futures on the floor of the Exchange in 1943 and both prior and subsequent thereto were members thereof. Therefore, the Taxpayer made all of his commodity futures purchases from other members of the Exchange and he made all of his sales of commodity futures to other members of the Exchange.

## The circuit court rejected the taxpayer's arguments, stating:

With the Corn Products opinion as a springboard, Faroll insists his faithful, virtually undivided, efforts devoted to commodity futures transactions constitute § 117(a)(1) "business" during which he held property (commodity futures) for sale to customers in the ordinary course of his trade or business. Here, this taxpayer is trying to fit the exchanging of cards, resulting in contracts between Board of Trade members, acting in response to price fluctuations, into the statutory words of exclusion. He can do so only by emptying §117(a)(1) of its contents. This is apparent for several reasons. Reference to Hoffman, Future Trading Upon Organized Commodity Markets In The United States, at page 118, cited as an authority by the Supreme Court in its first marginal note to Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 47, 76 S. Ct. 20, shows that the expanded definition of a commodity future, according to Hoffman is: "* * * an agreement to buy or sell, in accordance with law and the rules of an exchange, a definite quantity of a commodity at an agreed price at a future date, being entered into for the purpose of speculating on or hedging against price changes, and being usually closed out later by another offsetting future trade." We think it clear from the record before us that absent hedging, Faroll was a trader. Commissioner of Internal Revenue v. Covington, 5 Cir., 1941, 120 F. 2d 768, 771. * * *

\*      \*      \*      \*      \*      \*      \*

Even capital assets, uncontroverted in such classification, may be sold to a customer or customers without losing preferential treatment under the Code. Indeed, frequently, that is the tax-wise juncture of realization to the holder of such assets.

We find no evidence, in the stipulation and exhibits establishing that Faroll intended making or accepting delivery of a commodity upon the expiration of a future. * * *

\*      \*      \*      \*      \*      \*      \*

Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S. Ct. 20, seems to enlarge the scope of the exclusionary clause in §117 in policy fashion. For the Court had already pointed out in its opinion: "Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section [sec. 117(a)]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business." 1955, 350 U.S. 46, 51–52, 76 S. Ct. 20, 24. Yet, despite the reflection of Congressional intent described in Corn Products we think that the opinion is limited to hedging transactions. At least we are not persuaded that the decision encompasses Faroll's assumption of risk in dealing in commodity futures for the purpose of profiting from uncertain fluctuations in price. Just as any other possessor of a capital asset, Faroll owned property (here a claim or contract right) but these commodity futures were held by him primarily for price fluctuations—the buying and selling followed.

Thus it is clear that commodities once classified as capital assets will not lose their preferred status merely because the taxpayer engages in a full-time trading of those commodities. Obviously this will be true regardless of whether the taxpayer is an individual or an association taxable as a corporation.

Accordingly, we conclude that the gains and losses realized by the Funds from the sale of commodity futures and spot commodities were capital gains and capital losses. *Faroll* v. *Jarecki, supra.*

The next issue is whether LACO and therefore the petitioners composing LACO realized ordinary income rather than capital gains from LACO's management of the commodity trading accounts of the six Funds during the years 1951 through 1955.

Petitioners argue that the Funds were partnerships and that the profits from commodity trading were capital gains and losses. Petitioners conclude that since LACO was a partner its share of the partnership profits would also be capital gain.

Respondent contends that LACO had no property interest in the commodity futures and spot commodities, and that LACO's income from the management of the Funds' accounts represented compensation for personal services and, therefore, ordinary income rather than capital gain. Sec. 22(a), I.R.C. 1939; sec. 61(a), I.R.C. 1954.

We have already rejected petitioners' contention that the Funds were partnerships. It follows that the income cannot be capital gain under petitioners' above theory. Moreover, after a review of the evidence we conclude that the profits were ordinary income in the nature of compensation for personal services.

It is axiomatic that in order for LACO's profits to be considered capital gains, there must have been sales or exchanges of capital assets in which LACO had an economic interest. LACO actively solicited individuals to participate in the Funds which it managed. LACO's only expectation of income was from the successful management of other individuals' moneys. It was investing no money of its own. LACO did not manage each Fund in what it necessarily considered to be the best method, but purposely had a different investment policy for each Fund in order to attract both highly speculative and more conservative investors. Furthermore, despite the fact that the Contract of Participation between LACO and an investor stated that the parties would be coowners of all commodity futures acquired, the fact remains that LACO only had authority to manage the Funds and to withdraw a certain share of the profits. Under no circumstance was LACO permitted to withdraw any portion of an investor's cash contribution.

Thus we conclude that LACO had no economic interest in the commodity futures or spot commodities as such, but only an interest in

a share of the profits which might be realized from the trading of the commodities. Such an interest is not a capital asset. *Merton E. Farr*, 11 T.C. 552, affd. 188 F. 2d 254 (C.A. 6, 1951). It seems clear that LACO was receiving a share of the profits in return for its management services, and the gains it realized are ordinary income both to LACO and to the petitioners composing LACO. *Merton E. Farr, supra.*

The next issue is whether the petitioners composing LACO realized ordinary income rather than capital gains from their individual participation through personal investment in one or more of the six Funds during the years 1951 through 1955.

We have already held the Funds to be associations taxable as corporations. It follows that amounts actually distributed or made available to the participants in the Funds are dividend income to the extent of available earnings and profits. Petitioners have not shown earnings and profits to be a limiting factor. We therefore sustain respondent's determination that the petitioners composing LACO realized ordinary income in the form of dividends from their personal investments in the Funds.

The next issue relating to the Funds is whether LACO and therefore the petitioners composing LACO sustained a deductible loss by reason of the net losses reported by the six Funds in 1955. In 1955 LACO deducted what it considered to be its share of the net losses realized by the six Funds. Respondent disallowed said deductions.

Section 165(a), I.R.C. 1954, provides, "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." The Contract of Participation signed by LACO and individual cash participants in each Fund required that LACO be obligated to cover losses to the extent it had withdrawn profits during the period of cumulation. In the event of termination of the agreement LACO was responsible for losses only to the extent said losses exceeded the cash participant's investment. The burden is upon petitioners to establish that they sustained losses in 1955. There is no evidence that in 1955 the net losses in any Fund exceeded the investments of the participants in that Fund, or that LACO was obligated in any way to repay money to a Fund. Respondent's determination is sustained.

The final issue relating to the Funds is whether the petitioners composing LACO sustained losses in 1955 by reason of their individual participation through personal investment in one or more of the six Funds. We have found the Funds to be associations taxable as corporations. It follows that the losses incurred by the Funds in 1955 are not deductible by the stockholder-participants. Respondent's determination is sustained.

*Issues Relating to the Individual Trading Accounts.*

The first issue relating to the individual trading accounts is whether LACO and therefore the petitioners composing LACO realized ordinary income rather than capital gains from LACO's management of commodity trading accounts during 1951 through 1955.

Petitioners contend that LACO entered into a partnership agreement with each individual investor, and that LACO's share of the net gains from the commodity trading was capital gain. Respondent argues that no partnerships existed and that the gains LACO realized were simply compensation to LACO for managing the accounts, and therefore ordinary income.

Once again we point out that in order for LACO's profits to be considered capital gains, there must have been sales or exchanges of capital assets in which LACO had an economic interest. The evidence indicates that LACO simply solicited clients whose moneys it might manage for a contingent fee. LACO's only expectation of income was from the successful management of the clients' moneys. It was investing no money of its own. LACO managed each individual trading account to best serve the purposes of the client, with no consideration as to what type of investment policy might best serve LACO. Furthermore, despite the fact that the contract between LACO and an individual investor termed the agreement a "joint venture" and that it provided for LACO and the investor to be "co-owners" of all commodity interests acquired, the fact remains that LACO only had authority to manage the account and to withdraw a certain share of the profits. Under no circumstances was LACO permitted to withdraw any portion of an individual's cash investment.

Thus we conclude that LACO had no economic interest in the commodity futures and spot commodities as such, but only an interest in a share of the profits which might be realized from the trading of the commodities. As stated above, such an interest is not a capital asset. *Merton E. Farr, supra.* Moreover, there is no noteworthy evidence that the parties, particularly LACO's clients, really and truly intended to form partnerships with LACO. On the contrary, it would seem that all that was intended was an employer-employee relationship with a provision for payment of a percentage of the profits as compensation. Respondent's determination is sustained.

The next issue is whether LACO and therefore the petitioners composing LACO sustained deductible losses by reason of the net losses reflected in certain individual trading accounts during 1951 through 1955.

Some of the individual trading accounts suffered net losses during the years in issue. LACO deducted what it considered to be its share

of the losses as capital losses. Respondent determined that LACO sustained no losses during the years in question and disallowed the petitioners' deductions.

LACO's obligation to absorb losses in individual trading accounts was the same as its obligation relating to the Funds. Petitioners have presented no evidence establishing that the losses suffered in any account exceeded the cash commitments of the individual investors, or that LACO was obligated to or did in fact pay money into any account to cover a share of realized losses. In short, petitioners have failed to carry their burden of proving that they sustained losses during the taxable year not compensated for by insurance or otherwise. Respondent's determination is sustained.

## Issue Relating to Longstreet.

Longstreet had an agreement with LACO that LACO's portion of the profits realized from certain accounts in the Personal Trading Fund Account of LACO were to be attributed to Longstreet. Longstreet reported these profits as capital gains. Respondent determined the profits to be ordinary income in the form of compensation for personal services.

The parties have agreed that the decisions of the Court on the similar issues relating to LACO's profits from management of the Funds and individual trading accounts shall be determinative of this issue. We have held that the profits were ordinary income, and so hold on this issue. Respondent's determination is sustained.

## Additions to Tax.

Petitioners Longstreet, Smith, and Hilby failed to make timely payments of the final installments of their estimated tax for 1953. Payments were due on *Friday*, January 15, 1954. Payments were received on January 18 and 19. Consequently, respondent determined additions to tax pursuant to section 294(d)(1)(B). Petitioners have the burden of establishing that their failures to make timely payments were "due to reasonable cause and not to willful neglect." Petitioners have presented no evidence other than the dates of their payments. This evidence establishes the untimeliness of the payments but it does not explain the reason for the delay or offer any basis for a finding that the failures to make timely payments were "due to reasonable cause and not to willful neglect." We are not permitted to guess as to what might have been the cause of the delay. We hold that petitioners have failed to sustain their burden and respondent's determination is sustained.

Respondent also determined that 80 per cent of Longstreet's, Abbott's, Smith's, and Hilby's taxes for each of the years 1951

through 1953 as recomputed by him exceeded the estimated taxes declared and paid by petitioners, and accordingly determined additions to tax pursuant to section 294(d)(2).[7]

Petitioners argue that in no instance did 80 per cent of the tax reported on their returns exceed the estimated tax and conclude that they are not liable for additions. They urge that if 80 per cent of the tax as reported on the return is less than the estimated tax, then a taxpayer cannot be subject to an addition to tax for substantial underestimate in the event that at a later date his actual tax liability is determined to be greater than his reported tax. Petitioners cite *Schwartzkopf* v. *Commissioner*, 246 F. 2d 731 (C.A. 3, 1957), and *John Schraedel III*, a Memorandum Opinion of this Court dated October 16, 1958.

Neither of the above-cited cases supports petitioners' position. In *Schwartzkopf* the court held that the taxpayer was not liable for additions to tax because he had made timely payments of estimated tax greater than the amounts of tax shown on his returns for the preceding years. Stated another way, the taxpayer had in fact underestimated his estimated taxes but was not liable for the additions to tax because he came within an exception precluding the Commissioner from determining the additions.

Likewise, in *John Schraedel III*, *supra*, this Court held that the taxpayer was not subject to additions to tax because the estimated taxes were timely paid and exceeded the taxes shown on the returns for the preceding years.

Contrary to petitioners' contentions, it is well settled that a substantial underestimate of estimated tax has occurred if 80 per cent of the taxpayer's *actual tax liability* exceeds his estimated tax. *DeWitt M. Sherwood*, 20 T.C. 733; *H. R. Smith*, 20 T.C. 667. In the instant case it appears that 80 per cent of each of the petitioners' actual tax liabilities may exceed their estimated taxes for each of the years in issue. The evidence indicates that in March of each year in question

---

[7] SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT.

(d) ESTIMATED TAX.—

\* \* \* \* \* \* \*

(2) SUBSTANTIAL UNDERESTIMATE OF ESTIMATED TAX.—If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals \* \* \* exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter \* \* \* of such year \* \* \* in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year \* \* \* but otherwise on the basis of the facts shown on his return for the preceding taxable year.

each of the petitioners estimated his tax at considerably less than his reported tax for the preceding year and then amended his estimate substantially upward in the following January. None of the petitioners has established that he paid *timely quarterly installments* based upon estimated taxes at least as great as the taxes reported on his returns for the preceding years. Accordingly, none of the petitioners has established that he comes within any exception precluding the respondent from determining the additions to tax.

Respondent's determination of additions to tax under section 294(d)(2) is sustained as to such petitioners and for such years as the computation under Rule 50 reveals that 80 per cent of the actual tax liability, as determined herein, exceeds the estimated tax of such petitioner.

*Decisions will be entered under Rule 50.*