Lloyd D. Parkins and Elizabeth D. Parkins v. Commissioner.
Parkins v. Commissioner
Docket No. 1390-63.
United States Tax Court
T.C. Memo 1965-137; 1965 Tax Ct. Memo LEXIS 188; 24 T.C.M. (CCH) 731; T.C.M. (RIA) 65137; May 24, 1965
John J. Reha, Jr., Puget Sound Bank Bldg., Tacoma, Wash., for the petitioners. Walter John Howard, Jr., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent *189 determined deficiencies in petitioners' income tax for the years 1957 and 1960 in the amounts of $2,304.16 and $2,229.23, respectively. The deficiency for the year 1957 resulted from the disallowance of a net operating loss carryback to the year 1957 from the year 1960 which carryback had been previously tentatively allowed. The issue for decision is whether petitioners are entitled to a deduction in the year 1960 in the amount of $22,005 as their share of a loss from a joint venture or as a bad debt which became partially worthless in that year. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Tacoma, Washington, filed joint Federal income tax returns for the calendar years 1957 and 1960 with the district director of internal revenue, Tacoma, Washington. The principal source of reported income was from the operation of a tavern although there was income from other sources reported in each of these years. Petitioner Lloyd D. Parkins, hereinafter referred to as petitioner, has been engaged in the tavern business for a period of 24 years and this was his principal trade or business during the years *190 here involved. On Schedule H of their return for the calendar year 1960 petitioners claimed a loss from The Jacobs Venture (a joint venture) in the amount of $22,005. This amount represents 90 percent of $24,450, the unpaid balance of loans made by petitioners to the Sheridan Company, Inc. The net loss reported by petitioners in their 1960 income tax return was $11,145.61. Petitioners filed a Form 1045 applying for a tentative carryback adjustment resulting from a carryback of the net operating loss for the taxable year 1960, to the taxable year 1957. The reduction in tax liability for the taxable year 1957 claimed was $2,304.16. Under date of April 25, 1961, the office of the district director of internal revenue at Seattle, Washington issued a notice of allowance of tentative carryback adjustment, Form 7780-B, showing the amount allowed to be $2,304.16 and this amount was refunded to petitioners, plus interest in the amount of $34.94. In the years 1958 to 1960 there was in existence in Tacoma, Washington, a corporation known as The Sheridan Co., Inc., hereinafter referred to as Sheridan. Sheridan operated in the City of Tacoma, and its business consisted of the purchase and *191 sale of electrical equipment at wholesale. In 1958 Sheridan was short of finances and needed money to operate its business. In the latter part of 1957 Sheridan placed a blind advertisement in the Tacoma News Tribune. Frank M. Jacobs, hereinafter referred to as Jacobs, replied to this advertisement and was contacted by Robert J. Sheridan, the president of Sheridan. Upon being contacted by lenders, Sheridan offered to execute its promissory notes to lenders, which notes would provide for the return of principal plus a brokerage fee. Sheridan would give a series of promissory notes for the money loaned, it would take the borrowed funds and purchase merchandise and place it in public storage and give as collateral security, the warehouse receipts on the stored merchandise. The first loan by Jacobs to Sheridan was on January 2, 1958. This loan was in the principal amount of $21,600 and was secured by warehouse receipts for eight units of electrical equipment. The amount of $2,700 represented one unit. Six promissory notes of $4,000 each were executed by Sheridan, payable to Jacobs in monthly intervals for the total amount of $24,000. The amount of $2,400 represented the brokerage *192 fee for the loan, computed at $300 per unit. Petitioners had no financial interest in this loan. Jacobs and petitioner had been friends and business associates for some years prior to 1958. During 1958 Jacobs told petitioner about the loans he was making to Sheridan and petitioner asked if he could join in the loans with Jacobs. Jacobs agreed to allow petitioner to participate in the loans if the amount of loans requested by Sheridan was in excess of the funds Jacobs himself had available to lend to Sheridan. Various loans secured by warehouse receipts were made to Sheridan in which petitioner had a financial interest in the years 1958 and 1959, and one such loan was made in 1960. Petitioner and Jacobs did not contribute equal amounts of money into the loans made to Sheridan. Petitioner and Jacobs entered into a written agreement with respect to these loans under date of December 30, 1958. This agreement acknowledged advancement of $24,550 by petitioner to Jacobs for the loans to Sheridan. The written agreement entered into by petitioner and Jacobs under date of December 30, 1958, provided as follows: THIS AGREEMENT, Made and entered into this 30th day of December, 1958, by *193 and between FRANK M. JACOBS, Party of the First Part, and LLOYD D. PARKINS, Party of the Second Part, WITNESSETH THAT: For and in consideration of the premises it is hereby mutually agreed between the parties hereto as follows: (1). That from time to time the Second Party has advanced to the First Party certain sums of money to be invested by First Party in warehouse receipts of The Sheridan Co. Inc. and covering electric fixtures and supplies stored in the warehouse of Pacific Storage, Inc. at 1721 Jefferson Avenue, Tacoma, Washington. (2). It is agreed that the Second Party has paid to First Party as of the present time the sum of $24,550.00. (3). The party of the Second Part agrees that he has made such advancements and such investments, and such future advances that he may make, entirely on his own responsibility and at his own risk; that he is to participate on a pro-rata basis with First Party in the profits of such transactions, and if there are any losses he will participate in the same on a pro-rata basis; such pro-rata basis to be determined from the amount of capital investment each of the parties has in such transactions. (4). The earnings on such investments *194 shall be computed and paid on a quarterly basis commencing January 1, 1959. (5). It is agreed that no partnership arrangement or association has been entered into and that First Party is merely acting as agent of the Second Party for such investment or investments and that First Party is not to be restricted in any manner in the handling of the same; and that First Party operates under his own name entirely. (6). This agreement and this arrangement may be terminated at any time by either party hereto. IN WITNESS WHEREOF, The parties hereto have subscribed their names in duplicate this 30th day of December, 1958. Petitioner understood the purpose of this agreement to be to absolve Jacobs from any losses which might occur to petitioner. Under date of January 2, 1959, a similar written agreement was made between Jacobs and Ron W. Pepple, hereinafter referred to as Pepple. The agreement entered into between Jacobs and Pepple is identical to that executed between petitioner and Jacobs except as to the dates and the amount of money involved. Besides the loans secured by warehouse receipts, Jacobs made short-term loans or "quickie loans" of terms of 30 to 45 days to Sheridan, *195 which were secured by its merchandise on inventory. Petitioner participated in some of the short-term or "quickie loans." Petitioner and Jacobs entered into no written agreement other than the agreement of December 30, 1958, and petitioner entered into no written agreement with Pepple at any time. There were 12 different and separate loans made by Jacobs to Sheridan during the calendar year 1958. Petitioner did not participate in all of these loans. Petitioner participated in at least 5 of the 12 loans during 1958 commencing with a loan on June 5, 1958. Nine separate loans were made to Sheridan by Jacobs in 1959 on his own behalf and on behalf of Pepple and petitioner. One loan was made to Sheridan by Jacobs, Pepple and petitioner in 1960. Reports of these loans were prepared annually by Jacobs' bookkeeper, Jennie McKelvey. She also prepared and furnished petitioner quarterly reports showing his profits and withdrawals and in some instances containing explanatory notes. All transactions for the three lenders were handled by and through Jacobs. When an officer of Sheridan would contact Jacobs with respect to a loan to purchase additional units, if Jacobs had sufficient money to *196 handle the loan himself, he furnished the money, but if he did not he would contact petitioner or Pepple to use whatever money they wanted to put into the loan to Sheridan covering the number of units for which the money was loaned. The transactions were all handled in the following manner: Each time Sheridan would negotiate a loan with Jacobs it would execute a loan agreement. Each loan agreement was identical in its terms except the amounts involved and the dates varied. The loan would be made and Sheridan would simultaneously execute its series of promissory notes payable to the order of Jacobs. Sheridan would then purchase its merchandise, deposit it in public storage, and place its warehouse receipts in the custody of Jacobs. All transactions and paper relating to these transactions were issued by Sheridan to Jacobs. No papers or notes were issued by Sheridan to either petitioner or Pepple. Petitioner met Robert Sheridan, the major stockholder of Sheridan, and Robert Sheridan's wife while he was being shown through Sheridan's warehouse in 1958 by Jacobs. Jacobs introduced petitioner to Robert Sheridan as a friend. They did not discuss petitioner's participation in the loans *197 to Sheridan and Jacobs never informed an officer of Sheridan that petitioner participated in these loans Robert Sheridan stated to Jacobs that he only wanted to deal with one party. The only persons whom Jacobs took to Sheridan for the purpose of inspecting the stock of that company besides petitioner were Jennie McKelvey, a certified public accountant, and an attorney who represented Jacobs in certain business transactions. As and when payments were made by Sheridan on the promissory notes Jacobs would make a distribution of the payments in proportion to the amount that each party had loaned to Sheridan. Jacobs would call petitioner when he received a check from Sheridan in repayment of a loan in which petitioner had participated and ask petitioner to meet him at the bank. Jacobs would cash the check and ask the paying teller to give petitioner the amount which he and petitioner had determined to be the proportion of the payment due petitioner. If a portion was also due Pepple, Jacobs would take that amount in cash to deliver to Pepple and Jacobs would deposit the portion due to him in his account. No funds representing petitioner's or Pepple's portion of any payments by Sheridan *198 to Jacobs were ever placed in Jacobs' bank account. Neither Jacobs nor Pepple nor petitioner had any interest in Sheridan. On Schedule H of their income tax return for the years 1958 and 1959 petitioners reported the income earned on their loans to Sheridan in the amounts of $4,195.29 and $7,105.55, respectively, with the designation "brokerage fees" but with no reference to a joint venture or partnership. On or about September 21, 1960, Sheridan's stockholders voluntarily voted to dissolve and liquidate Sheridan. A Liquidating Trustee in Distribution was appointed out of Court. At a meeting of the creditors of Sheridan, Murray J. Anderson, attorney, Tacoma, Washington, was appointed trustee. At the time of this action to dissolve voluntarily, Sheridan owed Jacobs, Pepple and petitioner the total sum of $369,000, represented by six promissory notes. This indebtedness was composed of principal advances by petitioner and Jacobs and Pepple of $255,350, and uncollected fees of $113,650 as follows: Name o
Unpaid
Unpaid
lender
fees
principal
Total
Jacobs
$ 98,066.67
$202,600.00
$300,666.67
Pepple
8,366.67
28,300.00
36,666.67
Petitioner
7,216.66
24,450.00
31,666.66
Total
$113,650.00
$255,350.00
$369,000.00
*199 During the year 1960 a certified public accountant named Noble advised his client, Pepple, that the income he received from Jacobs as a result of loans to Sheridan should be reported on a partnership income tax return, Form 1065, or an information report, Form 1099. Noble thereupon contacted Jacobs and was informed by Jacobs that a partnership did not exist. A meeting was then held on January 4, 1961, by Noble, Charles Johnson (Jacobs' attorney), Jacobs, Jennie McKelvey (Jacobs' bookkeeper), and Pepple. It was agreed by the parties at this meeting that there was a joint venture and that a Form 1065 return should be filed. Based on representations in a letter written by the liquidating trustee that the creditors of Sheridan would receive not more than 10 percent of their accounts, a U.S. Partnership Return of Income, Form 1065, was filed for the year 1960 by Pepple, on or about January 10, 1961, for "The Jacobs Venture (a joint venture), c/o T. A. Noble, 710 Cherry Street, Room 210, Seattle 4, Washington" reflecting and claiming an operating loss of $229,815, as a result of bad debts in that amount. A copy of the trustee's letter with respect to the dissolution of Sheridan was made *200 a part of this Form 1065 return for the year 1960 as an explanation of the bad debt deduction. Form 1065 returns were subsequently filed by Pepple for "The Jacobs Venture" for the calendar years 1961 and 1962, the return for the year 1962 being filed as a final return. No Form 1065 return was filed by or on behalf of Jacobs, Pepple, and petitioner as a joint venture for any year prior to the calendar year 1960. Prior to the meeting on January 4, 1961, in the office of Jacobs' attorney there had been a series of meetings. Petitioner does not know Pepple personally but he did meet him once in Jacobs' office. Petitioner does not know Noble, the CPA who filed a partnership return with respect to the loans to Sheridan. On May 16, 1962, Murray J. Anderson as Trustee of Sheridan in voluntary dissolution filed his Report, Accounting and Petition In The Matter of The Sheridan Co., Inc., An Insolvent Corporation, No. 151278 in the Superior Court of the State of Washington in and for the County of Pierce. In open court on June 7, 1962, an order was entered approving the trustee's report and accounting and authorizing distribution in the matter of The Sheridan Co., Inc., An Insolvent Corporation *201 No. 151278. On Schedule B of their income tax returns for the years 1957 through 1960 petitioners reported interest income they received on certain promissory notes which they held, each of which was secured by either a real estate or a chattel mortgage. In the spring of 1957 petitioner loaned Steve Gierman $20,000 and took his promissory note which was secured by a real estate mortgage. A second note to Steve Gierman for $2,000 in the fall of 1957 was secured by a real estate mortgage. In 1958 a note and chattel mortgage was taken from Robert J. Bendzak for a loan in the amount of $5,000. In 1960 petitioner made a loan of $10,000 to Jacobs, and the promissory note which Jacobs gave him for the loan was secured by the assignment of a mortgage. These four promissory notes representing loans made by petitioner were turned over by petitioner to Pacific First Federal Savings and Loan, which acted as a collection agency for petitioner. In addition to these loans, petitioner had an outstanding loan which also had been turned over to Pacific First Federal Savings and Loan for collection purposes, and the interest on this loan was also reported by petitioners on their income tax returns. *202 Petitioners, on their income tax return for 1960 on "Schedule H. - Other Income or Losses," reported a loss of $22,005, with the following explanation: The Jacobs Venture (A Joint Venture), c/o T. A. Noble, 710 Cherry St., Seattle, Wash.
On January 3, 1963, respondent mailed to petitioners a statutory notice of deficiency wherein he disallowed this claimed share of a loss from a joint venture and the claimed net operating loss carryback to 1957 which had been previously tentatively allowed for the reason that no bona fide joint venture existed and petitioners did not incur any loss other than a nonbusiness bad debt. Opinion Petitioner's primary contention is that a pool, syndicate, or joint venture existed between Jacobs, Pepple, and petitioner in their transactions with Sheridan, and therefore under section 761 of the Internal Revenue Code of 1954, [1] this undertaking constituted a partners ip. Petitioner claims that the partnership sustained a loss in 1960 when it became apparent that only a small portion of the loans which were outstanding to Sheridan would be collectible, [2] and that petitioner's pro rata share of the partnership loss is a business *203 loss in 1960. Petitioner contends that he sustained a net operating loss in 1960 which he is entitled to carry back to the taxable year 1957. *204 Petitioner contends that if no pool, syndicate or joint venture existed between Jacobs, Pepple and petitioner, the loans to Sheridan were made in the course of petitioner's trade or business since petitioner made sufficient loans to be classed as being in the trade or business of making loans. Respondent takes the position that no pool, syndicate, or joint venture with Jacobs, Pepple, and petitioner as the associates or venturers therein existed and that the loans which petitioner made to Sheridan were made as a personal investment of petitioner and not in the course of a trade or business. Respondent contends that since the debt of Sheridan to petitioner was not a business debt that no portion of such debt is deductible in 1960 under section 166(a)(2) when admittedly it had not become completely, but only partially, worthless, and that in a subsequent year when the receivership was concluded and the uncollectible portion of the debt owed by Sheridan to petitioner became completely worthless it constituted a nonbusiness bad debt as defined in section 166(d). The term "partnership" as defined in section 761 includes "a syndicate, group, pool, joint venture, or other unincorporated *205 organization through or by means of which any business, financial operation or venture is carried on, and which is not, * * * a corporation or a trust or estate" within the meaning of the income tax law. Whether parties have entered into an arrangement which constitutes a partnership within this definition is ultimately a question of their intent, a conclusion of fact which necessitates a consideration of all the circumstances bearing on the transactions between the parties. Hubert M. Luna, 42 T.C. 1067, 1077 (1964). Petitioner here contends that the transactions with Sheridan involving petitioner, Pepple, and Jacobs constituted either a syndicate, pool, or joint venture. Petitioner states that the term "syndicate" denotes some form of organization and that the term "pool" applies to a less formal joint undertaking involving the combination of cash or other property of two or more persons in the hands of a selected manager, and contends that paragraph three of the agreement between petitioner and Jacobs sets forth all the elements required in the definition of pool or syndicate. This paragraph provides as follows: (3) The party of the Second Part [petitioner] agrees *206 that he has made such advancements and such investments, and such future advances that he may make, entirely on his own responsibility and at his own risk; that he is to participate on a pro-rata basis with First Party [Jacobs] in the profits of such transactions, and if there are any losses he will participate in the same on a pro-rata basis; such pro-rata basis to be determined from the amount of capital investment each of the parties has in such transactions. This agreement which petitioner refers to was entirely between Jacobs and petitioner, and although there existed a similar agreement between Jacobs and Pepple, there was no agreement between petitioner and Pepple. This type of agreement made by Jacobs with two unrelated individuals does not have the characteristics of a syndicate or pool as contended by petitioner. Furthermore, the manner of operation which we have set forth in our findings is not in the nature of an operation of a syndicate or pool. The more difficult question is whether petitioner's relationship with Jacobs might be classified as a joint venture within the meaning of section 761(a). A joint venture has been defined as a "special combination of two or *207 more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation" and as "an association of persons to carry out a single business enterprise for profit." Beck Chemical Equipment Corporation, 27 T.C. 840, 848 (1957), and cases there cited. Whether the parties intended to form a joint venture is to be gleaned from the same type of facts which would be relevant in determining the intention of the parties where the validity of a family partnership for income tax purposes is in question as was the situation in Commissioner v. Culbertson, 337 U.S. 733 (1949). Lucia Chase Ewing, 20 T.C. 216, 230 (1953), affd. on another issue 213 F. 2d 438 (C.A. 2, 1954), and Beck Chemical Equipment Corporation, supra. The fact that an agreement between parties terms an arrangement as a "joint venture" is not conclusive that such is the nature of the arrangement, Craig M. Smith, 33 T.C. 465, 478 (1957); nor is the fact that the agreement states that no partnership or similar association exists conclusive that the legal status of the operation is not a joint venture. *208 Estate of L. O. Koen, 14 T.C. 1406, 1409 (1950). Evidence bearing on the parties' intention includes whether a joint bank account was maintained by the parties, whether they kept joint books and had joint employees, and whether partnership returns were filed. Wm. J. Lemp Brewing Co., 18 T.C. 586, 597 (1952). The fact that a partnership return was not filed is not conclusive that the undertaking was not a joint venture, Estate of R. L. Langer, 16 T.C. 41, 47 (1951), affirmed per curiam 194 F. 2d 288 (C.A. 9, 1952), but is some evidence of the intention of the parties. Lawrence Y. S. Au, 40 T.C. 264 (1963), affd. 330 F. 2d 1008 (C.A. 9, 1964), certiorari denied 379 U.S. 960. Considering all the facts in this case, we conclude that no syndicate, pool, or joint venture within the meaning of section 761 existed involving petitioner, Pepple, and Jacobs, or between petitioner and Jacobs. The agreement between petitioner and Jacobs and the one between Pepple and Jacobs both specifically provide that "no partnership arrangement or association" has been entered into but that Jacobs is merely acting *209 as agent. No partnership returns were filed until after a loss had been sustained in 1960 and then only at the suggestion of an accountant. When this accountant first talked with Jacobs, Jacobs was firmly of the opinion no association in the nature of a partnership existed. There was no retaining of profits by any association but each payment which Jacobs received was divided. If any form of joint venture existed, it did not accumulate any profits to pursue the venture. Each separate loan was treated as a separate transaction. Cf. Boyle, Flag, & Seaman, Inc., 25 T.C. 43, 47, 48 (1955). While a joint venture or partnership may have a managing partner, such managing partner must manage for the mutual benefit. Here, Jacobs took the loans himself if he was financially able to do so and only allowed the participation of petitioner or Pepple where Sheridan wished to borrow more money than Jacobs had to advance. There were no mutual employees of petitioner, Jacobs, and Pepple, and the only records were those kept by Jacob's bookkeeper so that Jacobs would have available records for petitioner and Pepple showing the amounts he had loaned to Sheridan on their behalf and the *210 amounts of repayment and profit which had been received. The facts as a whole do not support a joint venture having any characteristics of a partnership but rather show Jacob's investing what money petitioner cared to invest acting in the nature of petitioner's agent. We hold that petitioner has not established that any loss was sustained in 1960 by a pool, syndicate or joint venture in which he participated either with Jacobs and Pepple or with Jacobs alone. Petitioner contends that if the transactions which he entered into with Jacobs and with Pepple did not constitute a syndicate, pool, or joint venture within the meaning of section 761, then he should be considered as being in the business of lending money, and therefore to the extent that his loan in 1960 to Sheridan became worthless in that year, it should be considered as a business bad debt which could be deducted as partially worthless in 1960. Respondent apparently agrees that the debt became partially worthless in 1960 but he contends that petitioner was not in the trade or business of lending money and therefore under the definition of section 166(d) [3] the debt was not a business debt and no portion thereof is deductible *211 until the year when it becomes completely worthless. The facts in this case show that in addition to the various loans made by petitioner to Sheridan in 1958, 1959, and 1960 petitioner made two loans in 1957, one in 1958 and one subsequent thereto to certain individuals. Insofar as this record shows these loans might have been made because of a personal relationship between petitioner and the borrowers. Therefore, in approaching the *212 problem of whether petitioner was in the trade or business of lending money the primary facts from which the question must be resolved are those surrounding petitioner's loans to Sheridan. Without question, petitioner's loans to Sheridan were made in a transaction entered into for profit. Petitioner owned no stock in Sheridan and knew nothing of Sheridan until Jacobs told him about the loans that he was making to Sheridan. Petitioner then asked Jacobs to permit him to participate in loans to Sheridan since petitioner thought that he would make a profit by lending money to Sheridan. Not all activities pursued for a profit constitute engaging in a trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). As stated in Whipple v. Commissioner at page 201, the provision of section 23(k) of the Internal Revenue Code of 1939, the predecessor of section 166(d) "was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax laws recognize as a trade or business, a concept which falls far short of reaching every income or profit-making activity." What constitutes a trade or business is basically a question of fact *213 to be determined from the nature of the activity engaged in. It has been held that the rental of one house constitutes a trade or business, even though the taxpayer is engaged in another primary trade or business. Leland Hazard, 7 T.C. 372, 375 (1946) and cases there cited. However, the selling of real property in a subdivided state constitutes a trade or business only if the transactions are sufficient and the activity such that it more partakes of the nature of the active carrying on of a trade or business than of the disposition of a capital asset. Kaltreider v. Commissioner, 255 F. 2d 833, 838 (C.A. 3, 1958) affirming 28 T.C. 121 (1952). The managing of a portfolio of securities with the attendant keeping of records as to receipt of dividends and interest, no matter how extensive and continuous, does not constitute a trade or business. Higgins v. Commissioner, 312 U.S. 212 (1941). The case of Whipple v. Commissioner, supra, dealt with loans made by the taxpayer there involved to a corporation in which he owned approximately 80 percent of the stock and the Court there concluded that the furnishing of regular services *214 to one or many corporations did not constitute a trade or business although there might exist a situation where a taxpayer could demonstrate that he was engaged in a regular trade or business of promoting corporations for a fee or commission. Petitioner distinguishes Whipple v. Commissioner, supra, on the ground that the taxpayer there involved was a stockholder in the corporation to which the loans were made whereas petitioner in the instant case was not a stockholder in Sheridan. While the type of profit which a lender might expect to glean from loans made to a corporation in which he was not a stockholder might differ from the type of profit which the lender might hope to obtain from a corporation in which he did own stock, the nature of the loans in each instance is the same if investment profit is the reason therefor. The loan is an investment unless the lender shows that he is in a trade or business of lending money. In the instant case petitioner made a number of separate loans to the same borrower. This indicates an investment by petitioner not dissimilar to an investment in other types of securities of a corporation rather than a business of lending money. Petitioner *215 relies on the case of George A. Butler, 36 T.C. 1097 (1961) for the proposition that he might be engaged in a business of lending money even though his primary business was the operation of a tavern. The Butler case does hold that a taxpayer may engage in more than one trade or business. However, the facts in the Butler case showed that the loans there involved were made by the taxpayer to a partnership of which he was a member and it was pointed out that where a taxpayer is a partner in a business, he, by reason thereof, is individually engaged in business. The conclusion in the Butler case was that the taxpayer had made loans as a partner to a business partnership in furtherance of and proximately related to the business of the partnership. The case was not concerned with whether the taxpayer individually was in the business of making loans. Petitioner also calls attention to the fact that there are cases holding that a taxpayer may be engaged in a trade or business of promoting corporations in order to make a profit on their sale. Such cases were distinguished by the Court in Whipple v. Commissioner, supra, with the following comment: * * * but in such *216 cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise and the principles of Burnet, Dalton, DuPont and Higgins are therefore not offended. * * * In the instant case the only profit petitioner hoped to get from his loans to Sheridan was the so-called "brokerage fee" or the extra amount paid by Sheridan for the use of petitioner's money. The facts as a whole in the instant case support the conclusion that petitioner was making an investment of funds with the expectation of making a profit from the investment. We therefore conclude on the basis of all the facts that petitioner has failed to establish that he was engaged in a trade or business of lending money and that the loan made by petitioner to Sheridan in 1960 was not a loan made in the course of petitioner's trade or business but was a nonbusiness loan which became a nonbusiness bad debt in a year subsequent to 1960. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 761. TERMS DEFINED. (a) Partnership. - For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. * * * ↩
2. The evidence never makes completely clear why the lien which petitioner, Jacobs, and Pepple had on electrical units purchased by Sheridan with the money which they advanced covered such a small portion of their loans. However, from piecing together various statements in the record, it appears that when the 1960 advance was made, Jacobs inspected the units at Sheridan's plant before they were hauled to the warehouse and did not examine the units after they were deposited in the warehouse. When Sheridan went into receivership and Jacobs checked on the units stored in the warehouse securing his notes, he discovered that the new units had been removed from the boxes and old equipment, almost worthless, placed therein, so that the recovery through the lien on property was negligible, and he was for most of the indebtedness, merely a general creditor.↩
3. SEC. 166(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsection (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩